# In the United States Court of Federal Claims

No. 13-532 C

(Filed December 12, 2013)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | Pre-Award Bid Protest; National |
| ECO TOUR ADVENTURES, INC., | * | Park Service Concessions |
| | * | Management Improvement Act |
| *Plaintiff*, | * | of 1998, 16 U.S.C. §§ 5951-5966 |
| | * | (2012); Right of Preference for |
| v. | * | Preferred Offerors; Procurement |
| | * | Integrity Act, 41 U.S.C. §§ 2101- |
| THE UNITED STATES, | * | 2107 (Supp. V 2011); Implied |
| | * | Contract to Consider Bids Fairly |
| *Defendant*. | * | and Honestly. |
| * * * * * * * * * * * * * * * * * * * * | | |

*Kevin R. Garden*, Alexandria, VA, for plaintiff.

*Joshua A. Mandlebaum*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, Washington, DC, for defendant.

———————————————

## OPINION AND ORDER

———————————————

**BUSH,** *Senior Judge.*

Now pending before the court are the parties' cross-motions for judgment on the administrative record. Plaintiff Eco Tour Adventures, Inc. (Eco Tour) filed a pre-award bid protest complaint on August 1, 2013, and filed an amended

---

[1] This opinion was issued under seal on November 26, 2013. Pursuant to ¶ 6 of the ordering language, the parties were invited to identify proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. The parties submitted their proposed redactions on December 11, 2013. Brackets ([ ]) identify the redacted portions of this opinion.

complaint on August 8, 2013.[2]  In this protest, Eco Tour objects to the anticipated award by the United States Department of the Interior, National Park Service (the Park Service or NPS) of two concession contracts to provide guided cross-country ski tours, including associated transportation and food services, in Grand Teton National Park.  Eco Tour alleges that certain actions taken by NPS in connection with its selection of cross-country ski touring concessioners were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Eco Tour seeks a permanent injunction, declaratory relief, and bid preparation costs, as well as attorney fees and costs incurred in pursuing this bid protest.

The administrative record (AR) was originally filed on August 12, 2013, and supplements to the AR were filed on September 6, 2013, and October 1, 2013.[3]  Briefing was filed according to an expedited schedule and oral argument was held on November 8, 2013.  As discussed below, the NPS violated applicable law, acted arbitrarily and capriciously, and abused its discretion in concluding that incumbent concessioners Jackson Hole Mountain Resort Corporation and The Hole Hiking Experience, Inc. submitted proposals that were "responsive" to the requirements of the prospectus and in allowing them to match the better terms of Eco Tour's proposals for the disputed contracts.  Accordingly, plaintiff's motion for judgment on the administrative record is granted, and defendant's motion for judgment on the administrative record is denied.[4]

---

[2]/  The court notes that plaintiff's name appears as "EcoTour" in several portions of the administrative record, including in plaintiff's proposals for the disputed contracts.  *See, e.g.*, AR Tabs 21-22.  However, the court will refer to plaintiff as "Eco Tour," as that is the spelling of plaintiff's name used in the complaint and amended complaint.

[3]/  On September 6, 2013, the government filed a supplement to the AR with documentation of the source-selection authority's final decisions.  AR Tabs 42-45.  On October 1, 2013, the court granted the government's unopposed motion to further supplement the AR to include a copy of the signed transmittal letter accompanying Jackson Hole Mountain Resort Corporation's proposal.  AR Tab 46.

[4]/  Although the court concludes that Eco Tour has prevailed on the merits of its bid protest, the court does not grant all of plaintiff's requested relief for the reasons discussed *infra*.

## BACKGROUND

## I.        Statutory and Regulatory Framework for NPS Concession Contracts

Congress first created the NPS in 1916, authorizing the Secretary of the Interior to "grant privileges, leases, and permits for the use of land for the accommodation of visitors in the various parks, monuments, or other reservations" under the Secretary's authority.  Act of Aug. 25, 1916, ch. 408, Pub. L. No. 64-235, § 3, 39 Stat. 535, 535; *Circle Line-Statue of Liberty Ferry, Inc. v. United States*, 76 Fed. Cl. 490, 491 (2007) (*Circle Line*).  From its inception, the NPS offered financial incentives to attract concessioners to provide services in National Park locations and to induce substantial capital investments on those lands.  *See Circle Line*, 76 Fed. Cl. at 491; S. Rep. No. 89-765, at 7 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3489, 3495.  These incentives included a preferential right of renewal, allowing an incumbent concessioner to renew its contract by matching the best offer of any competing bidder so long as it had performed its present contract satisfactorily.  *See Circle Line*, 76 Fed. Cl. at 491 (citation omitted); S. Rep. No. 89-765, at 7, 10-11.

For almost fifty years, the NPS recognized the preferential right of renewal as a matter of policy, although it did not generally write such a term within its concession contracts.  *Circle Line*, 76 Fed. Cl. at 491-92.  In 1965, however, Congress enacted the National Park Service Concession Policies Act, Pub. L. No. 89-249, 79 Stat. 969 (the 1965 Act), in order to "put into statutory form policies which, with certain exceptions, have heretofore been followed by the National Park Service in administering concessions."  S. Rep. No. 89-765, at 1.

In November 1998, Congress revisited the issue of renewal preferences in the National Park Service Concessions Management Improvement Act of 1998, Pub. L. No. 105-391, tit. IV, 112 Stat. 3497, 3503 (the 1998 Act) (codified at 16 U.S.C. §§ 5951-5966 (2012)), which repealed the 1965 Act and "establish[ed] a new and comprehensive concession management program for national parks." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 806 (2003) (*National Park Hospitality*); *see also Circle Line*, 76 Fed. Cl. at 492.  Having found that "[t]rue competition simply did not exist" in the award of concession contracts, Concession Contracts, 65 Fed. Reg. 20630, 20630 (Apr. 17, 2000), Congress restricted the right of preference set forth in the 1965 Act to apply only to

(1) "outfitting and guide" concessioners and (2) concessioners holding contracts with annual gross receipts under $500,000, 16 U.S.C. § 5952(7)-(8); *Circle Line*, 76 Fed. Cl. at 492; 65 Fed. Reg. at 20630-31.[5]

Under the 1998 Act, an outfitting and guide concessioner is entitled to exercise a right of preference if each of the following requirements is satisfied:

> (i)  the contract with the outfitting and guide concessioner does not grant the concessioner any interest . . . in capital improvements on lands owned by the United States within a unit of the National Park System [with certain exceptions not relevant here] . . .

> (ii)  the Secretary determines that the concessioner has operated satisfactorily during the term of the contract (including any extension thereof); and

> (iii)  the concessioner has submitted a responsive proposal for a proposed new contract which satisfies the minimum requirements established by the Secretary pursuant to [16 U.S.C. § 5952(4)].

---

[5]/ The 1998 Act defines the term "outfitting and guide concessions contract" as follows:

> [A] concessions contract which solely authorizes the provision of specialized backcountry outdoor recreation guide services which require the employment of specially trained and experienced guides to accompany park visitors in the backcountry so as to provide a safe and enjoyable experience for visitors who otherwise may not have the skills and equipment to engage in such activity. Outfitting and guide concessioners, where otherwise qualified, include concessioners which provide guided river running, hunting, fishing, horseback, camping, and mountaineering experiences.

16 U.S.C. § 5952(8)(B).

16 U.S.C. § 5952(8)(B).  In contrast, a concessioner holding a concession contract with annual gross receipts under $500,000 is entitled to exercise a right of preference if requirements (ii) and (iii) above are satisfied.  *Id.* § 5952(8)(C).

The 1998 Act directed the Secretary of the Interior to promulgate regulations "appropriate" for the implementation of the 1998 Act.  *Id.* § 5965.  Pursuant to this statutory grant of authority, the NPS promulgated implementing regulations in April 2000.  65 Fed. Reg. 20630 (codified at 36 C.F.R. §§ 51.1-51.104 (2013)).

Under the regulations, an incumbent concessioner that is eligible to exercise a right of preference is referred to as a "preferred offeror."  36 C.F.R. § 51.27(a).  A concessioner is a preferred offeror if each of the following conditions is met:

> (a)  The concessioner was a satisfactory concessioner during the term of its concession contract . . . ;
>
> (b)  The applicable new contract is a qualified concession contract . . . ;[6] and

---

[6]/  For purposes of 36 C.F.R. § 51.36(b), a new contract is a "qualified concession contract" if the NPS Director determines that:

> (a)  The new concession contract provides for the continuation of the visitor services authorized under a previous concession contract . . . ; and either
>
> (b)  The new concession contract . . . is estimated to result in . . . annual gross receipts of less than $500,000 . . . ; or
>
> (c)  The new concession contract is an outfitter and guide concession contract . . . .

*Id.* § 51.37.  "Visitor services" are defined as "accommodations, facilities and services determined by the Director as necessary and appropriate for public use and enjoyment of a park area provided to park area visitors for a fee or charge by a person other than the Director."  *Id.* § 51.3.  Such services "may include, but are not limited to, lodging, campgrounds, food service, merchandising, tours, recreational activities, guiding, transportation, and equipment rental."  *Id.*

> (c) If applicable, the concessioner's previous concession contract was an outfitter and guide concession contract . . . .

*Id.* § 51.36.

Preferred offeror status does not guarantee a right of preference, however. Under the regulations, in order to exercise a right of preference and match the best offer of any competing bidder, a preferred offeror must first submit a "responsive" proposal. *Id.* § 51.27(b) ("A right of preference is the right of a preferred offeror, *if it submits a responsive proposal for a qualified concession contract*, to match in accordance with the requirements of this part the terms and conditions of a competing proposal that the [NPS] Director has determined to be the best responsive proposal.") (emphasis added); *id.* § 51.30 ("A preferred offeror must submit a responsive proposal . . . if the preferred offeror wishes to exercise a right of preference."); *id.* § 51.31. A "responsive" proposal is "a timely submitted proposal that is determined by the Director as agreeing to all of the minimum requirements of the proposed concession contract and prospectus and as having provided the information required by the prospectus." *Id.* § 51.3.

If a preferred offeror fails to submit a responsive proposal, the preferred offeror "may not exercise a right of preference" and the contract "will be awarded to the offeror submitting the best responsive proposal." *Id.* § 51.31. If, however, the preferror offeror submits a responsive proposal, the NPS "must advise the preferred offeror of the better terms and conditions of the best proposal and permit the preferred offeror to amend its proposal to match them." *Id.* § 51.32. If a preferred offeror amends its proposal within the time period allowed by the NPS, and the NPS determines that the amended proposal matches the better terms and conditions of the best proposal, then the NPS "must select the preferred offeror for award of the contract upon the amended terms and conditions." *Id.* Conversely, "[i]f a preferred offeror does not amend its proposal to meet the terms and conditions of the best proposal within the time period allowed by the Director, the Director will select for award of the contract the offeror that submitted the best responsive proposal." *Id.* § 51.33.

**II.     The Disputed Contracts and Eco Tour's Bid Protest**

On December 20, 2012, NPS issued a prospectus, titled "A Concession Business Opportunity for Guided Ski Touring Services within Grand Teton National Park," soliciting proposals for three concession contracts – GRTE024-13, GRTE025-13, and GRTE032-13 – for the provision of guided cross-country ski touring services, including associated transportation and food services, in Grand Teton National Park.  AR Tabs 4-17 (prospectus and appendices).  Proposals for the contracts were to be submitted no later than March 20, 2013.  AR Tab 4 at 9, 27.

The concession services solicited by the prospectus are currently being provided by incumbent concessioners Jackson Hole Mountain Resort Corporation (Jackson Hole), under contract GRTE024-03; Powder Hounds, Inc., doing business as Rendezvous Ski Tours, under contract GRTE025-03; and The Hole Hiking Experience, Inc. (Hole Hiking), under contract GRTE032-03.  The NPS has "determined [that] the three existing Concessioners are qualified contracts and, therefore the existing Concessioners are Preferred Offerors for the New Contracts." AR Tab 4 at 24; *see also* Tab 2 at 4 (concluding that "[a]ll three Winter Ski Tour Contracts will be released as having preferred offeror status").  The agency's determination in that regard is not in dispute.

The prospectus included detailed instructions setting forth the protocol for submitting proposals and the selection factors to be used by the NPS to evaluate proposals.  *See* AR Tab 4 at 25-31.  Of particular relevance to this bid protest, the instructions state that "[o]nly an Offeror submitting a responsive proposal is eligible to be awarded the new concession contract."  *Id.* at 27.  The instructions define a "responsive proposal" as a "timely submitted proposal that is determined by the Service as agreeing to all of the minimum requirements of the draft concession contract and Prospectus and as having provided the information required by the Prospectus."  *Id.*  In addition, paragraph 1(d) of the instructions defines "information required by the prospectus" as "information expressly required by the Prospectus *and that is material, as determined by the Service, to an effective evaluation of the proposal under the applicable selection factor*."  *Id.* at 27 (emphasis added).

The instructions further provide that NPS, when evaluating proposals, "will apply the principal selection factors and secondary factors as set forth in 36 C.F.R. Part 51 by assessing each timely proposal under each of the selection factors on the basis of a narrative explanation discussing any subfactors when applicable and other supporting information." *Id.* at 28.[7]   The principal and secondary selection factors set forth in the instructions are:

> **Principal Selection Factor 1.**  The responsiveness of the proposal to the objectives, as described in the prospectus, of protecting, conserving, and preserving resources of the park area;

> **Principal Selection Factor 2.**  The responsiveness of the proposal to the objectives, as described in the prospectus, of providing necessary and appropriate visitor services at reasonable rates;

> **Principal Selection Factor 3.**  The experience and related background of the Offeror, including the past performance and expertise of the Offeror in providing the same or similar visitor services as those to be provided under the new concession contract;

> **Principal Selection Factor 4.**  The financial capability of the Offeror to carry out its proposal;

> **Principal Selection Factor 5.**  The amount of the proposed minimum franchise fee, if any, and/or other forms of financial consideration to the Service. Consideration of revenue to the United States will be subordinate to the objectives of protecting, conserving, and preserving resources of the park area and of providing necessary and appropriate visitor services to the public at reasonable rates; and

---

[7]/ The selection factors set forth in the prospectus are consistent with those set forth in the 1998 Act, *see* 16 U.S.C. § 5952(5), and the regulations, *see* 36 C.F.R. § 51.17.

. . . .

> **Secondary Selection Factor 1.**  The quality of the
> Offeror's proposal to conduct its operations in a manner
> that furthers the protection, conservation, and
> preservation of the park area and other resources through
> environmental management programs and activities,
> including, without limitation, energy conservation, waste
> reduction, and recycling.

*Id.* at 29.  Each proposal was to receive a "score that reflects the determined merits
of the proposal under the applicable selection factor and in comparison to the other
proposals received."  AR Tab 4 at 28.  The first four principal selection factors
were to be scored from zero to five; the fifth principal selection factor was to be
scored from zero to four; and the secondary selection factor was to receive a score
from zero to three.  *Id.*  The NPS would then "assign a cumulative point score to
each proposal based on the assigned score for each selection factor."  *Id.* at 29.

The prospectus also included a proposal package explaining the minimum
requirements of the disputed contracts as well as the information required by the
prospectus.  Part A of the proposal package sets forth the minimum requirements
of the disputed contracts.  *Id.* at 27, 41.  Although Part A states that principal
selection factors 3 and 4 "do not have specific requirements," it also states that
certain information "is required for principal selection factors 3 and 4" and that
"[f]ailure to provide material information required thereunder may result in an
offeror being deemed non-responsive."  *Id.* at 41.

Part B of the proposal package provides explanations for each of the
selection factors, and also sets forth various subfactors to be considered by the
NPS in evaluating proposals.  Of particular relevance here, the subfactors under
principal selection factor 4 list the specific information "*required*" by Part A of the
proposal package:

> **Subfactor 4(a).  Demonstrate that you have a credible,
> proven track record of meeting your financial
> obligations by providing the following:**

(1)  The completed Business History Information
Form provided on the next page. . . .
(2)  Financial statements for the two most recent
fiscal years in one of the following formats:

o  NPS Concessioner Annual Financial Reports
(AFR), including a current balance sheet if a
balance sheet was not submitted as part of the
AFR. . . .

(3)  A CURRENT credit report (within the last six
months) in the name of the Offeror from a major
credit reporting company such as Equifax,
Experian, TRW or Dun & Bradstreet. . . .

**Subfactor 4(b).  Demonstrate that your proposal is
financially viable and that you understand the
financial obligations of the Draft Contract by
providing the following:**

(1)  Please list . . . the personal property
(equipment) . . .  with monetary value over $500
that you will be using for this operation.  Please
note whether you currently own this equipment or
not. . . .

(2)  Please estimate the amount of money that you
will need to begin operating the business in the
format of the table below.  Only provide estimates
for the Personal Property items (Equipment) that
you need to acquire in order to begin operating.
Do not include items that you already own. . . .

(3)  Please demonstrate that your proposal is
financially feasible (that you will have a
reasonable opportunity to make a profit from your

10

business while carrying out the terms and
conditions of the Draft Contract) by completing
the Proforma Income Statement and Operating
Assumptions. . . .

    o   Please fully explain the assumptions on which you
base your projections and detail them sufficiently
so the Service can determine whether the
projections are realistic. . . .

**Subfactor 4(c).  Demonstrate your ability to obtain
the required funds for start-up costs under the Draft
Contract by providing credible, compelling
documentation, particularly evidence from
independent sources, such as bank statements,
financial statements, and signed loan commitment
letters.  Fully explain the financial arrangements you
propose, using the following guidelines:**

. . . .

(4)  Current bank statements must be provided,
regardless of the funding source . . . .  Current
bank statements must be provided even if you do
not anticipate significant start-up costs.

*Id.* at 49-54.

For contract GRTE024-13, the NPS received timely proposals from Eco
Tour, Jackson Hole (the preferred offeror), and two other offerors.  AR Tabs 20-
21.  For contract GRTE032-13, the NPS received timely proposals from Eco Tour,
Hole Hiking (the preferred offeror), and two other offerors.  AR Tabs 19, 22.  Eco
Tour did not compete for contract GRTE025-13; therefore, the only contracts in
dispute are contract GRTE024-13 and contract GRTE032-13.

An evaluation panel reviewed each proposal against the five principal
selection factors and one secondary selection factor, and assigned cumulative

11

scores to each proposal.  AR Tabs 23-24.  Eco Tour's proposals received the highest cumulative scores for both contract GRTE024-13 and contract GRTE032-13.  AR Tab 23 at 1094, Tab 24 at 1120.  The evaluation panel therefore determined that Eco Tour submitted the best proposals for both contracts.  AR Tabs 28-29, Tab 42 at 1272-75, 1304-07, Tab 43 at 1312-15, 1344-47.

In its evaluation of Jackson Hole's and Hole Hiking's proposals, the panel found that each offeror had omitted certain financial information specified by principal selection factor 4.  AR Tab 23 at 1112-16, Tab 24 at 1138-42, Tab 42 at 1273, Tab 43 at 1313.  Despite these omissions, the panel nevertheless found Jackson Hole's and Hole Hiking's proposals to be "responsive to the minimum requirements of the Prospectus."  AR Tab 30 at 1190, Tab 31 at 1193; *see also* AR Tab 42 at 1273-74, 1304-06, Tab 43 at 1313-14, 1344-46.  Accordingly, in letters dated June 20, 2013, the NPS advised Jackson Hole and Hole Hiking that they could exercise a right of preference by agreeing to match twelve terms of Eco Tour's proposals that the evaluation panel "determined were elements of a better offer":

1. **Principal Selection Factor 1 Subfactor (a).**  The best proposal committed to an Idle Free Policy to protect the air that surrounds the park as well as minimize any disturbance to wildlife from the sound of a running vehicle. . . .

2. **Principal Selection Factor 1 Subfactor (a).**  The best proposal committed to requiring guides to carry a minimum of one pair of binoculars on each tour to share with guests. . . .

3. **Principal Selection Factor 1 Subfactor (b).**  The best proposal committed to carrying a vehicle spill kit to contain fluid spills in case of leaks or accidents.  The best proposal committed to scanning the parking area and cleaning up any leaks from the vehicle. . . .  An example of a spill kit is the *Pig Spill Kit in Spill Pack*.

4.  **Principal Selection Factor 1 Subfactor (b).**  The best proposal committed to removing all solid human waste with human waste removal bags.  The best proposal committed to carrying one human waste removal bag per person, in addition to extra bags in case they are needed.  The best proposal committed to removing all toilet paper and hygiene products. . . .  An example of the human waste removal bags are the *Cleanwaste WagBag* products.

5.  **Principal Selection Factor 1 Subfactor (b).**  The best proposal committed to removing all trash created while on tours and disposing of the waste outside of the Park, in order to limit the frequency of trash trucks traveling in the park. . . .

6.  **Principal Selection Factor 2 Subfactor (b).**  The best proposal committed to requiring Wilderness First Responder certification for all guides. . . .

7.  **Principal Selection Factor 2 Subfactor (b).**  The best proposal committed to requiring all driving guides to complete a winter driving program. . . .

8.  **Principal Selection Factor 5 . . . .**  The best proposal committed to a franchise fee of 4.25% of annual gross receipts or a flat fee of $500, whichever is greater. . . .

9.  **Secondary Selection Factor 1 Subfactor (a).**  The best proposal committed to using reusable plates, reusable silverware, cloth napkins and reusable mugs on the tour in order to reduce the amount of trash produced on each tour. . . .

10. **Secondary Selection Factor 1 Subfactor (a).**  The best proposal committed to providing each guest

with a high quality, Made in America, reusable water
bottle for guest use on the tour.  Guests are given the
bottle to take home with them.  The goal of the water
bottle is to limit plastic petroleum disposable bottles
and encourage visitors to reuse their new water
bottle while in the area. . . .

11.  **Secondary Selection Factor 1 Subfactor (a).**  The
best proposal described how it will train its guides
about the Wilderness Act using, among other
methods, an online training course called "The
Wilderness Act of 1964" produced by the Eppley
Institute for Parks and Public Lands. . . .

12.  **Secondary Selection Factor 1 Subfactor (a).**  The
best proposal described how it will monitor the
accuracy of the information guides provide on tours
by having the owner or manager shadow each guide
unannounced at least once per season. . . .

AR Tab 30 at 1190-91, Tab 31 at 1193-94.

The NPS also asked both Jackson Hole and Hole Hiking to "expand on your
initial response . . . in order to bring the quality of your response up to the level of
the best proposal" by providing the financial information that had been omitted
from Jackson Hole's and Hole Hiking's proposals.  AR Tab 30 at 1192, Tab 31 at
1195.  In that regard, the NPS requested the following financial information that
had been omitted from Jackson Hole's proposal:

1.  **Principal Selection Factor 4 Subfactor (a).**  The
best proposal provided a complete set of financial
statements.  Although you submitted an Annual
Financial Report (AFR), it did not contain a balance
sheet.  Please submit a current balance sheet or a
balance sheet as of the year ending date of the AFR.

14

2.   **Principal Selection Factor 4 Subfactor (a).**  The best proposal provided a current credit report. Although you provided your Dun & Bradstreet Company ID, the National Park Service (Service) is unable to run the report.  Please submit a current credit report for each Offeror-Guarantor.

3.   **Principal Selection Factor 4 Subfactor (c).**  The best proposal provided a current bank statement as requested in Principal Selection Factor 4 Subfactor c, question 4.  Please submit a current bank statement.

AR Tab 30 at 1192.  Additionally, the NPS requested the following financial information that had been omitted from Hole Hiking's proposal:

1.   **Principal Selection Factor 4 Subfactor (a).**  The best proposal provided a complete set of financial statements.  Although you submitted an Annual Financial Report (AFR) it did not appear to be complete.  Please submit the complete AFR for 2011 and 2012.

2.   **Principal Selection Factor 4 Subfactor (b).**  The best proposal provided clear revenue and expense projection assumptions.  Please submit additional assumptions for your revenue and expense projections.  The panel is interested in understanding why revenue projections are so much higher than historical projections and why some of the expense assumptions appear low.

3.   **Principal Selection Factor 4 Subfactor (b).**  The best proposal provided a clear Pro forma.  Please correct the mathematical errors on the Pro forma and resubmit.

4. **Principal Selection Factor 4 Subfactor (c).** The best proposal provided substantial documentation related to its financial position. Although you provided a balance sheet and bank statement, the reporting period of the balance sheet did not correspond with the bank statement. The panel is interested in understanding your financial position, specifically, if you have a cash position to respond to any unanticipated expenses as you indicated you do not need any financing in Subfactor 4c. Please submit a current bank statement with a list of current liabilities.

AR Tab 31 at 1195.

Both Jackson Hole and Hole Hiking timely exercised a right of preference by agreeing to match the twelve terms set forth in NPS's June 20, 2013 letters and by providing the requested additional financial information. AR Tabs 25-26, Tabs 32-35, Tab 38, Tab 44 at 1368-83, Tab 45 at 1400-20.

Eco Tour filed its bid protest complaint in this court on August 1, 2013, and filed an amended complaint on August 8, 2013. Eco Tour's amended complaint contains three counts. In Count I, Eco Tour alleges that the NPS violated applicable law, acted arbitrarily and capriciously, and abused its discretion by finding that Jackson Hole's and Hole Hiking's proposals were "responsive" to the requirements of the prospectus and by allowing them to match the better terms of Eco Tour's proposals for contracts GRTE024-13 and GRTE032-13. In Count II, Eco Tour alleges that the NPS violated the Procurement Integrity Act, as amended, 41 U.S.C. §§ 2101-2107 (Supp. V 2011), by disclosing to Jackson Hole and Hole Hiking information that Eco Tour had allegedly marked in its proposal as confidential. Finally, in Count III, Eco Tour alleges that the NPS violated applicable law, acted arbitrarily and capriciously, and abused its discretion when it found that Jackson Hole and Hole Hiking had matched all of the better terms of Eco Tour's proposals for contracts GRTE024-13 and GRTE032-13. With respect to all three counts, Eco Tour further asserts that the NPS's actions breached an implied contractual obligation of the government to consider bids fairly and honestly.

16

On August 19, 2013, the court amended the briefing schedule to allow time for the government to obtain final decisions from the source-selection authority.[8] The source-selection authority subsequently determined that Eco Tour, Jackson Hole, and Hole Hiking had submitted responsive proposals for the contracts at issue, that Eco Tour's proposals were the best, and that Jackson Hole and Hole Hiking had amended their proposals to match the terms of Eco Tour's best proposals.  AR Tabs 42-45.  On September 4, 2013, the source-selection authority determined that contracts GRTE024-13 and GRTE032-13 should be awarded to Jackson Hole and Hole Hiking, respectively.  AR Tab 44 at 1352-53, Tab 45 at 1384-85.

## DISCUSSION

## I.    Jurisdiction

Before proceeding to the merits of Eco Tour's bid protest, the court must address the threshold issue of jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" (quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884))); *Hambsch v. United States*, 857 F.2d 763, 765 (Fed. Cir. 1988) ("When a court is without jurisdiction to hear a case, it is correspondingly without authority to decide the merits of that case.") (citations omitted).

Although the government does not question the court's jurisdiction to consider Eco Tour's claims, the parties dispute the source of that jurisdiction and,

_____

[8]/ On August 15, 2013, the government filed a motion to dismiss the amended complaint on ripeness grounds based on the government's assertion that the source-selection authority had not rendered final decisions with respect to the award of the disputed contracts.  On August 19, 2013, the court deferred ruling and suspended briefing on defendant's motion to allow the source-selection authority to render final decisions and to allow defendant to supplement the administrative record accordingly.  The government filed a supplement to the AR with documentation of the source-selection authority's final decisions on September 6, 2013, AR Tabs 42-45, and the government did not renew its motion to dismiss in connection with its motion for judgment on the administrative record.  Accordingly, the court denies defendant's motion to dismiss as moot.

correspondingly, the nature of the relief the court is authorized to grant.  Eco Tour
seeks injunctive and declaratory relief, as well as bid preparation costs, and asserts
that the court possesses jurisdiction to grant such relief pursuant to 28 U.S.C. §
1491(a)(1) (2006) and 28 U.S.C. § 1491(b)(1) (2006).  *See* Am. Compl. ¶ 1; Pl.'s
Mot. at 43-48.  Defendant contends that "[r]elief under 28 U.S.C. § 1491(b) is
unavailable because the contracts at issue are not procurements."  Def.'s Mot. at
28.  For the reasons specified below, the court agrees with the government that
section 1491(a)(1) – not section 1491(b)(1) – provides the jurisdictional basis for
Eco Tour's claims.

Section 1491(b)(1), which Congress added to the Tucker Act by enacting the
Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320,
sec. 12, § 1491, 110 Stat. 3870, 3874, grants the court "jurisdiction to render
judgment on an action by an interested party objecting to a solicitation by a Federal
agency for bids or proposals for a proposed contract or to a proposed award or the
award of a contract or any alleged violation of statute or regulation in connection
with a *procurement or a proposed procurement*."  28 U.S.C. § 1491(b)(1)
(emphasis added).  As the United States Court of Appeals for the Federal Circuit
has held, "relief under [section] 1491(b)(1) is unavailable outside the procurement
context."  *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245
(Fed. Cir. 2010) (*Resource Conservation*).  Thus, whether the court has jurisdiction
under section 1491(b)(1) depends upon whether the disputed solicitation for
concessions contracts involved a "procurement."

Section 1491(b) does not define the term "procurement."  However, for
purposes of determining the scope of section 1491(b), the Federal Circuit has
adopted the definition of "procurement" contained in 41 U.S.C. § 403(2), which
has been reorganized into 41 U.S.C. § 111 (Supp. V 2011).  *Resource
Conservation*, 597 F.3d at 1244 (citing *Distributed Solutions, Inc. v. United States*,
539 F.3d 1340, 1345-46 (Fed. Cir. 2008)).  Section 111 provides that "the term
'procurement' includes all stages of the process of acquiring property or services,
beginning with the process for determining a need for property or services and
ending with contract completion and closeout."  41 U.S.C. § 111.

The court has previously noted the existence of "conflicting authority as to
whether a solicitation for concession contracts is a 'procurement.'"  *Frazier v.
United States*, 79 Fed. Cl. 148, 160 & n.5 (2007), *aff'd*, 301 F. App'x 974 (Fed.

18

Cir. 2008).  This court has thrice ruled that concession contracts are not procurement contracts, albeit not in the specific context of a bid protest jurisdictional challenge.  *Terry v. United States*, 98 Fed. Cl. 736, 737 (2011) (holding that a concession contract for the operation of a t-shirt kiosk at Fort Benning was not a procurement contract subject to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109 (Supp. V 2011), because it did not involve the procurement of property or services by the government); *Frazier v. United States*, 67 Fed. Cl. 56, 59 (2005) (same with respect to a concession lease for the operation of a marina on a federal reservoir), *aff'd*, 186 F. App'x 990 (Fed. Cir. 2006); *YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 392 n.23 (1993) (*YRT Services*) (concluding that an NPS concession contract for the provision of "lodging, food and gift services" in Yosemite National Park "does not constitute a procurement, but is a grant of a permit to operate a business and the government is not committing to pay out government funds or incur any monetary liability").[9]

        In contrast to *YRT Services* and related decisions of this court, the Interior Board of Contract Appeals has consistently held that NPS concession contracts are procurement contracts subject to the CDA, *see, e.g.*, *Watch Hill Concessions, Inc.*, IBCA No. 4284-2000, 2001 WL 170911 (Feb. 16, 2001) (holding that "at least in any concession contract where the concessioner is required to perform specific services or to make specific improvements to the land it occupies, as is the case here, the contract is a procurement contract, subject to the Contract Disputes Act"), and the Government Accountability Office (GAO) has consistently held that concession contracts which involve the delivery of more than *de minimis* services to a federal agency are procurement contracts, *see, e.g.*, *Great South Bay Marina*,

---

        [9]/  In *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487 (2006), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007) (*Blue & Gold Fleet*), this court assumed, without deciding, that it had jurisdiction under section 1491(b) over a pre-award bid protest involving an NPS concession solicitation.  70 Fed. Cl. at 492.  Jurisdiction was not challenged on appeal, and the Federal Circuit likewise assumed, without deciding, that the Court of Federal Claims had jurisdiction under section 1491(b).  492 F.3d at 1313, 1315.  The Federal Circuit in *Blue & Gold Fleet* did not address the issue of whether NPS concession contracts are procurement contracts subject to section 1491(b).  This is unsurprising, given that *Blue & Gold Fleet* was decided before *Resource Conservation*, which clarified that section 1491(b)(1) bid protest jurisdiction is limited to the procurement context.  597 F.3d at 1245.  Because *Blue & Gold Fleet* did not address the issue of the jurisdictional basis for bid protests involving NPS concession contracts, it is not dispositive of that issue here.

*Inc.*, B-296335, 2005 CPD ¶ 135, 2005 WL 1650829, at *1 (Comp. Gen. July 13, 2005) ("It has consistently been our Office's view that a mixed transaction that includes the delivery of goods or services of more than *de minimis* value to the government is a contract for the procurement of property or services within the meaning of [the Competition in Contracting Act, 31 U.S.C. §§ 3551-3556 (2006)]." (citing *Starfleet Marine Transp., Inc.*, B-290181, 2002 CPD ¶ 113, 2002 WL 1461877 (Comp. Gen. July 5, 2002))).

The court, cognizant of the somewhat conflicting authority on this issue, concludes that the greater weight of authority is to the effect that NPS concession contracts, such as those in dispute in this bid protest, are not contracts for the procurement of goods and services, and thus are not subject to the court's section 1491(b) jurisdiction.  As an initial matter, the court notes that the prospectus at issue here "is issued under the authority of" the regulations set forth at 36 C.F.R. §§ 51.1-51.104, which are incorporated by reference into the prospectus and control in the event of any inconsistency between the terms of the prospectus and the regulations.  *See* AR Tab 4 at 27.  In the regulations, the NPS has taken the position that NPS concession contracts "are not contracts within the meaning of [the CDA] and are not service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions."  36 C.F.R. § 51.3; *see also National Park Hospitality*, 538 U.S. at 806 (quoting 36 C.F.R. § 51.3); 65 Fed. Reg. at 20635 ("NPS concession contracts [under the 1998 Act] do not procure services for the government; rather, they authorize third parties to provide services to park area visitors.").

Although the court is not bound to accept the agency's views regarding NPS concession contracts, the agency's reasoning finds support in the language of the 1998 Act, which indicates in several places that NPS concession contracts are for the provision of goods and services to the public, not to the government.  *See, e.g.*, 16 U.S.C. § 5952 (directing the Park Service to enter into concession contracts "to authorize a person, corporation or other entity to provide accommodations, facilities and services *to visitors to units of the National Park System*") (emphasis added); *id.* § 5955 (requiring that "[e]ach concessions contract shall permit the concessioner to set reasonable and appropriate rates and charges for facilities, goods, and services *provided to the public*") (emphasis added).  The 1998 Act also requires that "[a] concessions contract shall provide for payment to the government

of a franchise fee or such other monetary consideration as determined by the Secretary." 16 U.S.C. § 5956; *see also* AR Tab 4 at 24, 41, 55, 64 (prospectus stating that concessioners will be charged a "franchise fee" equal to at least three percent of the concessioner's gross receipts or a flat fee of $500, whichever is greater). Thus, according to the language of the 1998 Act itself, NPS concession contracts appear to be unlike traditional government procurement contracts insofar as the government does not make payments to the contractor in exchange for the provision of goods or services to the government; instead, concessioners pay the government a fee for the privilege of charging the public for services provided to the public. *See YRT Services*, 28 Fed. Cl. at 392 n.23. The essence of NPS concession contracts is not the acquisition of goods or services by the government, but the grant, for a fee, of certain rights to private contractors.

The agency's reasoning also finds support in the legislative history of the 1998 Act. The committee reports accompanying the 1998 Act concluded that Park Service concession contracts "do not constitute contracts for the procurement of goods and services for the benefit of the government or otherwise." S. Rep. No. 105-202, at 39 (1998); H.R. Rep. No. 105-767, at 43 (1998).

Additionally, it is worth noting that the United States Court of Appeals for the District of Columbia Circuit has concluded, in the context of a challenge to 36 C.F.R. § 51.3, that NPS concession contracts are not procurement contracts subject to the CDA. *See Amfac Resorts, L.L.C. v. Dep't of the Interior*, 282 F.3d 818, 835 (D.C. Cir. 2002) ("A procurement contract . . . is a contract for which the government bargains for, and pays for, and receives goods and services. Concession contracts are not of that sort.") (citation and internal quotation marks omitted), *vacated on other grounds sub nom National Park Hospitality*, 538 U.S. 803. Although the D.C. Circuit's opinion in *Amfac Resorts* was later vacated by the United States Supreme Court on ripeness grounds, *see National Park Hospitality*, 538 U.S. at 808-12, its analysis nevertheless provides further support for the conclusion that NPS concession contracts are not procurement contracts because they do not involve the payment of money or conferral of a benefit by the government in exchange for goods and services.

The court has considered Eco Tour's arguments in support of section 1491(b) jurisdiction and finds them unpersuasive. In its reply brief, Eco Tour argues that "the contracts at issue qualify as procurements by NPS of services,

21

through contractors, that meet NPS's statutory obligations" under the 1998 Act. Pl.'s Reply at 22. This *ipse dixit* argument carries no authoritative weight, and avails Eco Tour nothing. Accordingly, the court concludes that the concession contracts in dispute are not procurement contracts and, consequently, the court lacks jurisdiction under section 1491(b).

As noted, Eco Tour also alleges that defendant's actions breached an implied contractual obligation to treat offerors fairly. *See* Am. Compl. ¶¶ 105, 115, 122; Pl.'s Mot. at 40-42. This court has long had jurisdiction, under 28 U.S.C. § 1491(a), to hear cases and grant relief premised on the theory that when the government invites bids or solicits proposals from the public, it enters into an "implied-in-fact" contract to consider those bids or proposals fairly. *See e.g.*, *Resource Conservation*, 597 F.3d at 1242; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331 (Fed. Cir. 2001); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998); *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1573 (Fed. Cir. 1983). The Federal Circuit recently held, in *Resource Conservation*, that this court's implied-in-fact contract jurisdiction under section 1491(a) survives, post-ADRA, for bid protests in which section 1491(b) may not provide a remedy. 597 F.3d at 1245-47. Based on this binding precedent, the court concludes that it has jurisdiction over Eco Tour's implied contract claims under section 1491(a).

## II.   Standards of Review

### A.   Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### B.     Bid Protest Review

The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*).  Bid protest standing is limited to those plaintiffs who are actual or prospective bidders and whose direct economic interest would be affected by the award of the contract or by the failure to award the contract. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citation omitted).  In the circumstances of a pre-award protest where, as here, an award decision has been made but not finalized, a protester possessing a "substantial chance" of winning the disputed contract has a "direct economic interest" and has standing before this court. *Id.* at 1348-49.

Upon determining that a plaintiff has standing to sue, the court next considers the merits of the bid protest.  A bid protest proceeds in two steps, with the trial court first determining whether the government acted without a rational basis or contrary to law, and then determining as a factual matter whether the plaintiff was prejudiced by the arbitrary or unlawful conduct. *Bannum*, 404 F.3d at 1351.

The standard of review for the typical bid protest brought pursuant to section 1491(b) is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (the APA standard).  28 U.S.C. § 1491(b)(4) (incorporating the APA standard set forth in 5 U.S.C. § 706 (2012)); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under the APA standard, a procurement decision may be set aside if it lacks a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute or regulation. *Banknote*, 365 F.3d at 1351; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa*, 238 F.3d at 1332-33).

The APA standard is "highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.  Under this standard, *de minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  A bid protest plaintiff bears the burden of proving that a

significant error marred the procurement in question.  *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).  Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

Similarly, to recover under the implied contract for bids to be fairly and honestly considered in a protest brought pursuant to section 1491(a), a plaintiff must establish that the agency acted arbitrarily or capriciously, or abused its discretion.  *Southfork*, 141 F.3d at 1132 (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203 (Ct. Cl. 1974) (*Keco II*)); *Distributed Solutions, Inc. v. United States*, 106 Fed. Cl. 1, 25 (2012) (citations omitted), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013); *FAS Support Servs., LLC v. United States*, 93 Fed. Cl. 687, 694 (2010) (citing *Keco II*, 492 F.2d 1200).  The standard of review for a bid protest alleging a breach of the implied contract under section 1491(a) is, therefore, "essentially the same" as the APA standard applicable to protests pursued under section 1491(b).  *FAS Support*, 93 Fed. Cl. at 694.

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  If, on the other hand, the protester has shown a significant error in the procurement process, the court must determine as a factual matter whether that error prejudiced the protester, because both error and prejudice are required for the protester to prevail.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

A bid protest plaintiff bears the burden of establishing prejudice. *Bannum*, 404 F.3d at 1358.  To meets its burden, a protester must show that there was a "substantial chance" it would have received the contract, but for the agency's alleged error. *Bannum*, 404 F.3d at 1353; *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999); *Data Gen. Corp.*, 78 F.3d at 1562. This "substantial chance" inquiry is the same as that applied to determine a protester's standing.  Thus, in this bid protest, the "substantial chance" standard must be applied twice: first, to determine EcoTour's standing to bring its suit; and, second, to determine whether EcoTour suffered prejudice as a result of any adjudged errors in the procurement process. *See, e.g.*, *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 695-96 (2010) (differentiating between "allegational prejudice" and "APA prejudice," both of which apply the "substantial chance" test).

## III.   Standing

Although the government has not challenged Eco Tour's standing in either its motion for judgment on the administrative record or its reply brief, standing is a threshold inquiry that the court must address before considering the merits. *ITAC*, 316 F.3d at 1319.  As stated *supra*, bid protest standing is limited to those plaintiffs with a substantial chance of winning the contracts at issue in the protest. *Orion*, 704 F.3d at 1348-49.  The record demonstrates that Eco Tour submitted responsive proposals that received the highest cumulative scores of any of the proposals received by the NPS for the disputed contracts.  AR Tab 23 at 1094, Tab 24 at 1120, Tabs 28-29, Tab 42 at 1272-74, Tab 43 at 1312-14.  Thus, under the regulations, there is a substantial chance that Eco Tour would have been awarded the disputed contracts if not for the errors alleged in the amended complaint. *See* 36 C.F.R. §§ 51.31, 51.33.  Accordingly, the court concludes that Eco Tour has standing to bring its bid protest.

## IV.   Analysis of the Merits

Eco Tour challenges three determinations by the NPS as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  First, Eco Tour challenges the agency's determination that Jackson Hole and Hole Hiking submitted "responsive" proposals despite their failure to include certain financial information required by the prospectus.  Second, Eco Tour alleges that

the Park Service violated applicable law – including the Procurement Integrity Act and the implied contract to consider bids fairly and honestly – by disclosing to Jackson Hole and Hole Hiking information that Eco Tour had allegedly marked in its proposal as confidential.  Third, Eco Tour alleges that the NPS improperly failed to require Hole Hiking to match one of the better terms of Eco Tour's proposal for contract GRTE032-13, and therefore improperly determined that Hole Hiking had matched all of the better terms of Eco Tour's proposal for that contract.

### A.   The Agency's "Responsiveness" Determination (Count I)[10]

With respect to Count I, Eco Tour asserts that Jackson Hole and Hole Hiking omitted from their proposals certain financial information required by the prospectus, and that the NPS therefore erred in determining that these preferred offerors' proposals were "responsive."[11]  Pl.'s Mot. at 19-37.  In this regard, Eco

---

[10]/  The court is mindful that, in procurements subject to the Federal Acquisition Regulation (FAR), the concept of responsiveness is generally confined to sealed bidding.  *See Excel Mfg., Ltd. v. United States*, 111 Fed. Cl. 800, 806 & n.3 (2013); *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 468 (2008) (citations omitted).  By contrast, "[i]n negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (citations and internal quotation marks omitted).  As explained *supra*, solicitations for NPS concession contracts are not "procurements" subject to the FAR.  Moreover, as the government correctly noted at oral argument, the NPS's determination of the "responsiveness" of proposals for the disputed contracts is mandated by the particular regulations governing NPS concession contracts.  Tr. at 53-54; *see also* 36 C.F.R. §§ 51.27, 51.30-51.31.  Accordingly, the aforementioned authorities confining the concept of responsiveness to sealed bidding are inapplicable in the unique context of NPS concession contracts.

[11]/  Eco Tour also argues that Jackson Hole's proposal was non-responsive because Jackson Hole did not submit a signed transmittal letter with its proposal as required by the prospectus.  Pl.'s Mot. at 14-15, 22-23; *see* AR Tab 4 at 27 (prospectus instructions stating that "[f]ailure to submit a signed Offeror's Transmittal Letter . . . will make your proposal non-responsive"), 35 (proposal package stating that the transmittal letter "indicates your acceptance of the terms and conditions of the concession opportunity as set forth in this Prospectus" and "must bear original signatures"), Tab 20 at 638-40 (Jackson Hole's unsigned transmittal letter).  However, after the filing of Eco Tour's motion, the government supplemented the AR to include a copy of the signed transmittal letter accompanying Jackson Hole's proposal.  *See* AR Tab 46.

(continued . . .)

Tour relies upon the regulations implementing the 1998 Act, which define a "responsive" proposal as "a timely submitted proposal that is determined by the Director as agreeing to all of the minimum requirements of the proposed concession contract and prospectus *and as having provided the information required by the prospectus*."   36 C.F.R. § 51.3 (emphasis added).

The court agrees with Eco Tour that the prospectus required each offeror to submit with its proposal certain financial information to allow the NPS to evaluate the financial capability of the offeror to carry out its proposal.  As noted, Part A of the proposal package stated that certain information "is required for principal selection factors 3 and 4," and that "[f]ailure to provide material information required thereunder may result in an offeror being deemed non-responsive."  AR Tab 4 at 41.  Part B of the proposal package listed the specific financial information "required" by Part A.  *Id.* at 49-54.

The court also agrees with Eco Tour that neither Jackson Hole nor Hole Hiking submitted with their proposals all of the financial information required by the prospectus.  With its proposal for contract GRTE024-13, Jackson Hole provided: (1) a business history form; (2) Annual Financial Reports (AFRs) for two previous years; (3) a chart of the equipment to be used and its value; (4) a pro forma income statement; and, (5) a chart of financial "operating assumptions."  AR Tab 20 at 705-23.  However, Jackson Hole's proposal did not include the balance sheet or credit report required under principal selection subfactor 4(a) or bank statements required under principal selection subfactor 4(c).  AR Tab 23 at 1112, Tab 30 at 1192, Tab 42 at 1305-06.

With its proposal for contract GRTE032-13, Hole Hiking provided:  (1) a business history form; (2) AFRs for two previous years; (3) a balance sheet; (4) a credit report; (5) a chart of the equipment to be used and its value; (6) a pro forma income statement; (7) a chart of financial "operating assumptions"; and, (8) bank statements from January and February 2013.  AR Tab 19 at 588-613, 615-18, 620-26.  However, the Park Service found that the AFRs submitted by Hole Hiking were incomplete, AR Tab 24 at 1139, Tab 31 at 1195, Tab 43 at 1345-46, and

---

Therefore, Eco Tour's additional responsiveness argument is unsupported by the record.  Indeed, Eco Tour did not continue to advance that particular argument in either its reply brief or at oral argument.

noted that Hole Hiking failed to completely explain its revenue and expense projections, AR Tab 24 at 1140, Tab 31 at 1195.  The Park Service also determined that the pro forma income statement submitted by Hole Hiking contained "numerous mistakes," AR Tab 24 at 1140, including "mathematical errors," AR Tab 31 at 1195.  Additionally, the Park Service concluded that the January and February 2013 bank statements submitted by Hole Hiking did not correspond to the reporting period of Hole Hiking's balance sheet, and therefore the Park Service was unable to ascertain whether Hole Hiking's cash position was sufficient "to respond to any unanticipated expenses" in light of Hole Hiking's assertion that it did not require any financing for start-up costs.  AR Tab 31 at 1195.  Finally, the NPS determined that Hole Hiking's balance sheet contained certain unspecified "anomalies," AR Tab 43 at 1346, and noted that "without notes to explain the balance sheet, the panel was concerned with the financial position of the Offeror," AR Tab 24 at 1139.

Despite these omissions, the NPS found that Jackson Hole's and Hole Hiking's proposals were "responsive to the minimum requirements of the Prospectus" because the agency determined that the omitted financial information was not material to an effective evaluation of the proposals.  AR Tab 37 at 1244 ("The lack of quality and omissions [in the preferred offerors' proposals] were reflected in lower scores for the preferred offerors; however, the omissions were not significant enough to hamper an effective evaluation of the proposals."), Tab 40 at 1268 (same), Tab 42 at 1305-06 (responsiveness determination for Jackson Hole), Tab 43 at 1345-46 (responsiveness determination for Hole Hiking).  In that regard, the NPS relied upon paragraph 1(d) of the prospectus instructions, which limits the meaning of the term "information required by the prospectus" to only such information as is "*material, as determined by the Service*, to an effective evaluation of the proposal under the applicable selection factor."  AR Tab 4 at 27 (emphasis added).

Eco Tour first contends that paragraph 1(d) of the prospectus instructions is contrary to the regulations insofar as it limits the definition of "information required by the prospectus" to information that is expressly required by the prospectus *and* is deemed "material" by the NPS.  Pl.'s Mot. at 27-32; Pl.'s Reply at 4-5.  Next, Eco Tour contends that, even if the NPS were allowed to impose such a "materiality" limitation, the agency acted arbitrarily and capriciously, and abused its discretion, in determining that the financial information omitted from

Jackson Hole's and Hole Hiking's proposals was not material to an effective evaluation of those proposals.  Pl.'s Mot. at 32-37; Pl.'s Reply at 6-10.  Therefore, to resolve Eco Tour's claims with respect to Count I, the court must determine whether the NPS violated applicable law, acted arbitrarily and capriciously, or abused its discretion in determining that the financial information omitted from Jackson Hole's and Hole Hiking's proposals was not material.

### 1. Eco Tour's Objection to the Materiality Limitation Set Forth in Paragraph 1(d) of the Prospectus Instructions

Eco Tour first contends that the NPS acted contrary to law and abused its discretion by limiting the definition of "information required by the prospectus" to only such information that the NPS deems "material . . . to an effective evaluation of the proposal under the applicable selection factor."  Pl.'s Mot. at 30.  In that regard, Eco Tour relies upon the definition of "responsive" set forth in 36 C.F.R. § 51.3, and contends that paragraph 1(d) of the prospectus instructions is "directly contrary to the plain language of" 36 C.F.R. § 51.3 insofar as the regulation "does not include a provision that allows NPS to limit the term 'required' to information which NPS, in its discretion, determines is 'material to an effective evaluation of the proposal.'"  Id.  Eco Tour also argues that paragraph 1(d) constitutes an improper "expan[sion] [of] the very limited exception set by Congress for when a concessioner can exercise a right of preference and evade true competition."  Id. at 31.  For the reasons specified below, the court concludes that the NPS neither acted contrary to law nor abused its discretion in imposing a materiality limitation.

### a. Eco Tour Waived Any Objection to Paragraph 1(d)

Defendant argues that Eco Tour's contention that "materiality" cannot be a factor in evaluating responsiveness is a challenge to paragraph 1(d) of the prospectus instructions, and, as such, is waived because Eco Tour failed to object to paragraph 1(d) before the deadline for the submission of proposals.  See Def.'s Mot. at 11-12 (citing *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007)).  The court agrees.

It is axiomatic that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives it ability to raise the same objection

subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet*, 492 F.3d at 1313. Citing the desire to prevent contractors "from taking advantage of the government and other bidders" and to "avoid[] costly after-the-fact litigation," the Federal Circuit, in *Blue & Gold Fleet*, stated that "'[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award.'" *Id.* at 1314 (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362-63 (Fed. Cir. 2009). *Blue and Gold Fleet* thus prevents a protester from raising *post hoc* objections to the terms of a solicitation. That is precisely what Eco Tour seeks to do here. Eco Tour's argument that the materiality limitation in paragraph 1(d) of the prospectus instructions conflicts with 36 C.F.R. § 51.3 is, essentially, an allegation of patent error in the prospectus. Having failed to object to the materiality limitation before the deadline for the submission of proposals, Eco Tour has waived its right to do so before this court. *See Blue & Gold Fleet*, 492 F.3d at 1313.

In an attempt to avoid the waiver rule announced in *Blue & Gold Fleet*, Eco Tour asserts that it is not challenging the terms of the prospectus, but rather invoking the prospectus's own mechanism for resolving conflict between the terms of the prospectus and the regulations, which are incorporated by reference into the prospectus and control in the event of any inconsistency. *See* Pl.'s Mot. at 30 n.8 ("[B]ecause the terms of the Prospectus were not defective, Eco Tour was not required to challenge those terms prior to the submission of its proposal."); Pl.'s Reply at 13. Eco Tour's argument in this regard is unpersuasive and unsupported. A patent ambiguity is "present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000). To the extent that there is any conflict between the prospectus instructions and the regulations incorporated by reference into the contract – insofar as the former impose a materiality limitation on the definition of "information required by the prospectus" – any such conflict is a patent ambiguity regarding which Eco Tour "'had a duty to seek clarification from the government'" before the close of bidding. *Blue & Gold Fleet*, 492 F.3d at 1314 (quoting *Stratos*

*Mobile Networks*, 213 F.3d at 1381).  Accordingly, Eco Tour's challenge to the materiality limitation in paragraph 1(d) is waived.[12]

### b.   The Materiality Requirement in Paragraph 1(d) Is Consistent with 36 C.F.R. § 51.3

Even assuming, *arguendo*, that Eco Tour did not waive its right to challenge the materiality limitation in paragraph 1(d), its challenge fails for the additional reason that such a limitation is not contrary to law.  As noted *supra*, 36 C.F.R. § 51.3 defines a "responsive" proposal as "a timely submitted proposal that is determined by the Director as agreeing to all of the minimum requirements of the proposed concession contract and prospectus and as having provided the information required by the prospectus."  Although section 51.3 does not expressly provide for a materiality limitation, it also does not preclude such a limitation.  Indeed, by including the phrase "determined by the Director," section 51.3 confers discretion upon the NPS to determine whether a proposal has provided the information required by the prospectus.  Contrary to Eco Tour's argument, this conferral of discretion is sufficiently broad to allow the NPS to place limits on the definition of "information required by the prospectus."

Neither is paragraph 1(d) in conflict with the 1998 Act.  Eco Tour argues that by imposing a materiality limitation the NPS "is improperly trying to expand the very limited exception set by Congress for when a concessioner can exercise a right of preference and evade true competition."  Pl.'s Mot. at 31.  Yet, the 1998 Act provides that outfitting and guide concessioners such as Jackson Hole and Hole Hiking are entitled to exercise a preferential right of renewal if, *inter alia*, the concessioner "has submitted a responsive proposal for a proposed new contract which satisfies the minimum requirements established by the Secretary pursuant to [16 U.S.C. § 5952(4)]."  16 U.S.C. § 5952(8)(B)(iii).

---

[12]/  The only authority Eco Tour cites in support of its argument that it was not required to challenge paragraph 1(d) before the close of bidding is *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 681-82 (2012).  *See* Pl.'s Mot. at 30 n.8.  That case is inapposite because it did not involve a challenge to the terms of a solicitation, but rather a challenge to the agency's evaluation of proposals.  Eco Tour's reliance upon the court's passing statement that a chart contained in the solicitation "could, with effort, be harmonized with the weighting scheme presented on the previous page of the solicitation," *BayFirst*, 102 Fed. Cl. at 681, is therefore fruitless.

Moreover, the materiality limitation in paragraph 1(d) is consistent with analogous precedent applying provisions of the FAR in the context of negotiated procurements. Under such precedent, "'a proposal that fails to conform to the *material* terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (emphasis added) (quoting *E.W. Bliss*, 77 F.3d at 448); *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 518 (2012) ("It is blackletter law that a procuring agency may only accept an offer that conforms to the *material* terms of the solicitation." (emphasis added) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009))). Although such FAR-based cases are not directly applicable to the concession contracts at issue in this bid protest, they further undermine Eco Tour's contention that a materiality component to responsiveness is contrary to law. *See YRT Services*, 28 Fed. Cl. at 414 n.33 ("[T]he language and experience represented by the FAR is helpful for reference purposes.").

### 2. Was the Agency's Materiality Determination a Responsibility Determination?

The government argues that because the information omitted from Jackson Hole's and Hole Hiking's proposals related to their financial ability to carry out their proposals, the NPS's determination that these omissions were immaterial was a responsibility determination, not a responsiveness determination. Def.'s Mot. at 14; Def.'s Reply at 4-6. As such, defendant contends that the agency's materiality determination is "effectively unreviewable absent a claim of fraud or bad faith." Def.'s Mot. at 14; Def.'s Reply at 5. Inasmuch as Eco Tour has not formally alleged fraud or bad faith on the part of the NPS, the government argues that Eco Tour's challenge to the agency's responsiveness determination "need not be considered further by the Court." Def.'s Mot. at 15; *see also* Def.'s Reply at 6.

In response, Eco Tour asserts that the deference typically afforded to an affirmative determination of responsibility is inappropriate here because the NPS "was not making a threshold 'responsibility' determination with regard to this information, but in fact was evaluating, comparing and scoring proposals on a 0-5 point scale pursuant to Principal Selection Factor 4 and as required by the

regulations."  Pl.'s Reply at 11; *see also id.* ("This information was not part of a 'yes/no' responsibility determination, it was sought as part of an effort to evaluate and score each offeror's capabilities by comparing them to the other offerors."). Eco Tour also argues that "in making 'responsibility' determinations under the FAR, government agencies do not identify specific information that must be provided as NPS did here, but instead they allow bidders to provide whatever information they believe would show their 'responsibility' after bids are opened." Pl.'s Reply at 12 (citing *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1299 (Fed. Cir. 1999), and *Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226 (1990)).  Here, by contrast, the prospectus requires specific financial information and the regulations governing NPS concession contracts provide very limited circumstances in which proposals may be amended or supplemented after the deadline for submitting proposals has passed.  Pl.'s Reply at 12 (citing 36 C.F.R. § 51.15(a) (allowing offerors to amend or supplement proposals after submission only if "requested by the Director to do so and the Director provides all offerors that submitted proposals a similar opportunity to amend or supplement their proposals")).

The court agrees with Eco Tour that the NPS's materiality determination was not a responsibility determination.  Although a determination of an offeror's financial capability is traditionally considered to pertain to the offeror's responsibility, *e.g.*, *Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 413 (Fed. Cl. 2013) ("A responsibility evaluation includes consideration of financial backing as well as the ability to meet the operational requirements of the contract . . . .") (citations omitted); *Blount*, 22 Cl. Ct. at 227; *see also* 48 C.F.R. § 9.104-1 (2012) (setting forth "general standards" for responsibility in the procurement context, including "adequate financial resources to perform the contract, or the ability to obtain them"), here the offerors' financial capability is one of several evaluation factors considered under a comparative assessment of the various proposals.  By contrast, a determination of responsibility is a "pass/fail inquiry."  *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 527 (2010) (citing 48 C.F.R. § 9.103); *see also Frontier Sys. Integrators, LLC*, B-298872.3, 2007 CPD ¶ 46, 2007 WL 776887, at *5 (Comp. Gen. Feb. 28, 2007) ("Our Office has long held that pass/fail evaluations of capability issues, such as past performance, are tantamount to responsibility determinations, with the result that a rating of 'unacceptable' in these areas is the same as a determination of nonresponsibility." (citing *Phil Howry Co.*, B-291402.4, 2003 CPD ¶ 33, 2003 WL 282206 (Comp.

Gen. Feb. 6, 2003))).  A consideration of responsibility-related factors, such as financial capability, in the context of a comparative assessment of proposals does not constitute a responsibility determination.  *See, e.g.*, *PlanetSpace*, 92 Fed. Cl. at 546 ("Standing apart from the responsibility determination, however, procuring agencies may, in the context of a comparative evaluation of proposals, use traditional responsibility criteria, such as considering an offeror's financial resources and past performance." (citing *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984), and *YRT Services*, 28 Fed. Cl. at 394-95)); *YRT Services*, 28 Fed. Cl. at 394-95 ("'Agencies commonly use responsibility related factors in the evaluation process, notwithstanding the fact that a responsibility determination must ultimately be made. . . .  This process does not constitute a responsibility determination . . . .'" (quoting John Cibinic, Jr. and Ralph C. Nash, Jr., *Formation of Government Contracts* 547 (2d ed. 1986))).

The court has considered the government's arguments to the contrary and finds them unpersuasive.  Defendant cites several cases in support of its argument that the NPS's materiality determination was a responsibility determination that is "effectively unreviewable absent a claim of fraud or bad faith."  Def.'s Mot. at 14-15; Def.'s Reply at 4-6 (citing *John C. Grimberg*, 185 F.3d at 1303, *Trilon Educ. Corp. v. United States*, 578 F.2d 1356, 1358 (Ct. Cl. 1978), *News Printing Co., Inc. v. United States*, 46 Fed. Cl. 740, 746 (2000), and *Blount*, 22 Cl. Ct. at 227).  However, none of these cases involved an assessment of responsibility-related factors, such as financial capability, in the context of a comparative assessment of proposals.  Rather, each involved a "pass/fail" determination of responsibility (*i.e.*, was the offeror responsible or not?).  Accordingly, defendant's case law is inapposite.[13]

---

[13]/  Additionally, even if defendant's case law were applicable, the government overreaches when it suggests that responsibility determinations are "effectively unreviewable" absent allegations of fraud or bad faith.  Indeed, the government conceded so at oral argument by pointing the court to *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001), in which the Federal Circuit rejected an argument, virtually identical to that made by the government here, that "absent allegations of fraud or bad faith," a responsibility determination is "immune from judicial review."  238 F.3d at 1333; *see* Tr. at 55.  In disposing of that argument, the Federal Circuit concluded that the government had "seriously misread" the Court of Claims' decisions in *Keco Indus., Inc. v. United States*, 492 F.2d 1200 (Ct. Cl. 1974) (*Keco II*), and *Trilon Educ. Corp. v. United States*, 578 F.2d 1356 (Ct. Cl. 1978), which the

(continued . . .)

Additionally, in its reply brief, defendant appears to argue that the NPS's materiality determination constitutes a responsibility determination because it was a "yes/no" determination (*i.e.*, were the omissions material or not?).  Def.'s Reply at 6 ("What Eco Tour does contest is NPS's separate 'yes/no' determination that the responses to [principal selection factor] 4 were 'material,' and therefore responsive. . . .  These are responsibility determinations.").  But both responsiveness and responsibility are "yes/no" inquiries.  Thus, the "yes/no" character of the agency's materiality determination does nothing to transform it from a responsiveness determination to a responsibility determination.

For these reasons, the court rejects defendant's attempt to characterize the NPS's materiality determination as one of responsibility, which the court would normally afford heightened deference.  Accordingly, the court will address whether the agency's materiality determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

> ### 3. Was the NPS's Materiality Determination Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law?

>> #### a. Jackson Hole's and Hole Hiking's Failure to Provide Current Bank Statements (Principal Selection Subfactor 4(c))

The NPS determined that neither Jackson Hole nor Hole Hiking submitted current bank statements demonstrating their ability to obtain funds for start-up costs as required under principal selection subfactor 4(c).  AR Tab 23 at 1115, Tab 30 at 1192, Tab 31 at 1195, Tab 42 at 1305-06.  The NPS nevertheless found these omissions to be immaterial because both Jackson Hole and Hole Hiking indicated in their proposals that, as incumbent concessioners, they had no start-up costs.  With respect to Jackson Hole, the agency stated as follows:

---

Federal Circuit determined "impose no such limits" on judicial review of responsibility determinations.  *Impresa*, 238 F.3d at 1333.

> [Principal selection subfactor 4(c)] requests that the
> Offeror demonstrate its ability to obtain the required
> funds for any start-up costs under the new Contract.  It
> also requests the Offeror to provide a bank statement.
> Jackson Hole responded that [principal selection
> subfactor 4(c)] is not applicable because Jackson Hole is
> already operating as the current concessioner.  Jackson
> Hole did not provide a bank statement.  The Panel
> concluded that Jackson Hole's status as the incumbent
> concessioner supported Jackson Hole's assertion that it
> had no start-up costs.  Thus, Jackson Hole did not need to
> demonstrate funding to support such costs, and provided
> a material response.

AR Tab 42 at 1306; *see also* AR Tab 20 at 664-65 (Jackson Hole's proposal stating that the requirements in the prospectus to identify property to be acquired and the source of funding for start-up costs were "not applicable").  Similarly, with respect to Hole Hiking, the NPS stated that "Hole Hiking responded in [principal selection subfactor 4(b)] that it would not have any start-up expenses and the response in [principal selection subfactor 4(c)] supported this assertion."  AR Tab 43 at 1346; *see also* AR Tab 19 at 614, 619 (Hole Hiking's proposal stating that it would have no start-up costs).

Eco Tour argues that the NPS erroneously accepted Jackson Hole's and Hole Hiking's representations that they had no start-up costs.  Pl.'s Mot. at 24-25, 36-37; Pl.'s Reply at 7-8.  In that regard, Eco Tour notes that Jackson Hole stated, on a chart listing the equipment to be used by Jackson Hole in carrying out contract GRTE024-13, that it "anticipated" purchasing a [ ] and [ ] "for Season 2014."  AR Tab 20 at 720.  Eco Tour further notes that Hole Hiking stated, in the portion of its proposal related to principal selection subfactor 2(a), that "[a]t the beginning of the year, we order new [ ] and [ ]."  AR Tab 19 at 581.  In light of these anticipated purchases, Eco Tour asserts that Jackson Hole and Hole Hiking did, in fact, have start-up costs, and therefore the NPS acted arbitrarily and capriciously in accepting Jackson Hole's and Hole Hiking's contrary representations.  Pl.'s Mot. at 24-25, 36-37; Pl.'s Reply at 7-8.

The court agrees with Eco Tour that the NPS arbitrarily and capriciously determined that Jackson Hole and Hole Hiking had no start-up costs and that their failure to provide bank statements was immaterial.  Although the evaluation panel, in its evaluation of Jackson Hole's proposal, acknowledged Jackson Hole's anticipated purchase of a [ ] and [ ], AR Tab 23 at 1114, the panel subsequently ignored this information in its responsiveness evaluation, in which it concluded that "Jackson Hole's status as the incumbent concessioner supported Jackson Hole's assertion that it had no start-up costs," AR Tab 42 at 1306.  Similarly, in concluding that Hole Hiking had no start-up costs, *see* AR Tab 43 at 1346, the panel completely ignored Hole Hiking's anticipated purchase of [ ] and [ ] "[a]t the beginning of the year," AR Tab 19 at 581.

To the extent that the panel mentioned this information at all in its responsiveness determinations, it merely noted that "Jackson Hole's anticipated purchases were not firm commitments" and that Jackson Hole's failure to identify these as start-up costs "is immaterial because these purchases are not required by the terms of the Prospectus, including the Draft Contract."  AR Tab 42 at 1306. Defendant relies upon this statement to argue that Jackson Hole's failure to provide bank statements to prove its financial ability to make its anticipated purchases was immaterial because such purchases were not required by the terms of the prospectus.  Def.'s Mot. at 18; Def.'s Reply at 9-10 (citing AR Tab 42 at 1306). This argument fails for the simple reason that nothing in principal selection subfactors 4(b) or 4(c) limits the requirement to identify start-up costs (and to demonstrate financial ability to pay for such costs by providing bank statements) to only those start-up costs specifically required by the prospectus.  To the contrary, principal selection subfactor 4(b)(2) directed offerors to "provide estimates for the Personal Property items (Equipment) that you need to acquire in order to begin operating," AR Tab 4 at 51, and principal selection subfactor 4(c) directed offerors to demonstrate their "ability to obtain the required funds" for such start-up costs, AR Tab 4 at 54.

Defendant's additional arguments fare no better.  For instance, defendant argues that Hole Hiking's failure to report [ ] and [ ] as start-up costs, and to provide bank statements demonstrating its ability to obtain funds for such costs, is immaterial because the total cost of the [ ] and [ ] is low and "will likely not prevent Hole Hiking from performing the contract."  Def.'s Mot. at 19; *see also* Def.'s Reply at 10.  However, nothing in principal selection subfactors 4(b) or 4(c)

37

limits the requirement to identify start-up costs (and to demonstrate financial ability to pay for such costs) to only those start-up costs above a certain dollar amount.  To the contrary, principal selection subfactor 4(c) expressly states that "[c]urrent bank statements must be provided *even if you do not anticipate significant start-up costs*."  AR Tab 4 at 54 (emphasis added).

Finally, defendant argues that, even assuming that Jackson Hole and Hole Hiking failed to demonstrate their ability to obtain the required funds for start-up costs, Eco Tour's proposal suffered from the same defect, and should likewise be rejected as non-responsive, because Eco Tour failed to explain the cost of and to demonstrate funding for its anticipated conversion to natural gas.  Def.'s Mot. at 18-19 (citing AR Tab 21 at 901 (describing Eco Tour's plan to convert one-half of its vehicles to natural gas "in the first year after a compressed natural gas filling station comes to . . . Jackson, Wyoming," and to convert the other half the following year, with unspecified "viable grant sources"), and Tab 22 at 1086 (same)).  This argument is similarly unpersuasive because, unlike Jackson Hole and Hole Hiking, both of whom anticipated making purchases of equipment at the beginning of the 2014 winter season, Eco Tour anticipated converting one-half of its vehicles to natural gas "in the first year after a compressed natural gas filling station comes to . . . Jackson, Wyoming," and the other half "during the second year that [a natural gas] fuel source is available in Jackson."  AR Tab 21 at 901, Tab 22 at 1086.  Although Eco Tour "estimate[d]" that a compressed natural gas filling station would arrive in Jackson "in early 2014," this was merely an estimate and, ultimately, outside of Eco Tour's control.  *Id.*  Thus, Eco Tour's anticipated conversion to natural gas cannot reasonably be deemed to constitute a start-up cost.

**b.**  **Jackson Hole's Failure to Provide a Balance Sheet and Credit Report (Principal Selection Subfactor 4(a))**

The NPS also determined that Jackson Hole failed to provide a balance sheet and credit report as required under principal selection subfactor 4(a).  AR Tab 23 at 1112, Tab 30 at 1192, Tab 42 at 1305-06.  The NPS nevertheless concluded that these omissions were immaterial because the NPS was able to obtain the missing information by reviewing Jackson Hole's business history form, AFRs, and financial projections and assumptions:

> [Principal selection subfactor 4(a)] requests the Offeror to demonstrate that it has a credible, proven track record of meeting financial obligations by submitting (1) a business history form; (2) a balance sheet; (3) Annual Financial Report (AFRs) (for current concessioners) OR financial statements (for interested parties who are not current concessioners); and (4) a credit report. Jackson Hole submitted a complete business history form and two years of AFRs. However, Jackson Hole did not submit a balance sheet, and provided a Dun & Bradstreet Company ID instead of a physical copy of the credit report. The Service does not have access to credit reporting services.

> By analyzing the business history form and the AFRs in combination with the projections and assumptions supplied in [principal selection subfactor 4(b)], the panel determined that Jackson Hole had a credible proven track record of meeting its financial obligations and would have the operating income to satisfy its liabilities. All of the information supplied on the business history form was positive, and both of Jackson Hole's AFRs revealed a positive net income. A balance sheet and physical credit report might have provided further corroboration, but the Panel did not view these omissions as material.

AR Tab 42 at 1305-06.

Eco Tour argues that the NPS could not effectively evaluate Jackson Hole's financial ability to carry out its proposal without the balance sheet and credit report, and, therefore, the NPS arbitrarily and capriciously determined that Jackson Hole's failure to provide these documents was immaterial. Pl.'s Mot. at 34-35; Pl.'s Reply at 6-7. In that regard, Eco Tour first asserts that Jackson Hole's business history form consists solely of uncorroborated "one-word responses" to general questions regarding Jackson Hole's recent history of default, bankruptcy, foreclosure, receivership, or litigation related to unmet financial obligations. Pl.'s Mot. at 35 (citing AR Tab 20 at 719). Next, Eco Tour argues that the AFRs

submitted by Jackson Hole "merely pertain to [Jackson Hole's] revenues and expenses under the prior contract," and do not demonstrate anything about Jackson Hole's "track record of meeting its financial obligations." Pl.'s Mot. at 35 (citing AR Tab 20 at 705-18); *see also* Pl.'s Reply at 7 ("Nowhere in those documents does [Jackson Hole] state its current credit status, amount of assets, funding or available cash."). As a result, Eco Tour contends, the NPS "was totally unaware of the status of [Jackson Hole's] current cash assets, its corporate balance sheet health and its credit rating." Pl.'s Reply at 7.

The court agrees with Eco Tour that the NPS acted arbitrarily and capriciously in concluding that Jackson Hole's failure to provide a balance sheet and credit report was immaterial to an effective evaluation of Jackson Hole's history of meeting its financial obligations. Principal selection subfactor 4(a) required Jackson Hole to "[d]emonstrate . . . a *credible, proven* track record of meeting [its] financial obligations." AR Tab 4 at 49 (emphasis added). The financial information Jackson Hole supplied did not demonstrate such a track record. While the AFRs submitted by Jackson Hole indicate its gross receipts and expenses under its current contract, they provide no information regarding the extent of Jackson Hole's liabilities or its credit history. *See* AR Tab 20 at 705-18. At most, the AFRs demonstrate that Jackson Hole has achieved a positive net income under its current contract. A positive net income, however, cannot allay potential concerns regarding the extent of Jackson Hole's liabilities as compared to its assets, nor can it demonstrate that Jackson Hole has a history of paying its debts. Additionally, although the pro forma income statement and operating assumptions submitted by Jackson Hole under principal selection subfactor 4(b) demonstrate Jackson Hole's projections and assumptions regarding its *future* performance and profitability, they provide no information regarding Jackson Hole's *prior* "track record" of meeting its financial obligations. *See* AR Tab 20 at 721-23. Therefore, the NPS's conclusion that Jackson Hole's AFRs, pro forma income statement, and operating assumptions were sufficient to demonstrate Jackson Hole's "track record of meeting its financial obligations" was arbitrary and capricious.

Defendant posits that Jackson Hole's business history form – on which Jackson Hole indicated, *inter alia*, that it had never defaulted on a concession contract, had no recent bankruptcies or foreclosures, and had been the subject of no recent lawsuits or administrative proceedings – adequately demonstrated Jackson

Hole's history of meeting its financial obligations.  Def.'s Mot. at 18 (citing AR Tab 20 at 719).  Defendant argues that the NPS was entitled to "accept Jackson Hole's responses without confirming their accuracy."  *Id.* at 17.  In support of this argument, defendant quotes from *L-3 Global Communications Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 609 (2008), for the proposition that "the test for noncompliance is generally a test of facial noncompliance, not a test as to whether the subjective, undisclosed intent of an offeror is noncompliant with the solicitation's requirements," and *Akal Sec., Inc. v. United States*, 103 Fed. Cl. 310, 326 (2011), for the proposition that "[c]ontracting officers generally are entitled to rely on information available to them at the time of a responsibility determination, absent any indication that the information is defective, unsupported, or suspect."  Def.'s Mot. at 17.  Yet, in making this argument, defendant ignores the plain language of principal selection subfactor 4(a), which required Jackson Hole to demonstrate a "credible" and "proven" record of meeting its financial obligations by presenting documentary proof in the form of a balance sheet and credit report.  AR Tab 4 at 49.  Defendant also relies upon inapposite case law.  Unlike *L-3 Global*, in which "all three bids were facially compliant with the solicitation's requirements," 82 Fed. Cl. at 612, Jackson Hole's proposal omits required financial information and, thus, is noncompliant on its face.  Defendant's citation to *Akal* is likewise off the mark because *Akal* involved a determination of whether the prevailing bidder was a "responsible offeror," not whether it had submitted a proposal that was responsive to the material terms and conditions of the solicitation.  *See* 103 Fed. Cl. at 324-26.

### c. Deficiencies in Hole Hiking's Financial Records (Principal Selection Subfactors 4(a) and 4(b))

Finally, as noted, the NPS determined that Hole Hiking's financial documents omitted information and contained errors.  AR Tab 24 at 1139-40, Tab 31 at 1195, Tab 43 at 1345-46.  Specifically, the NPS concluded that:  (1) the AFRs submitted by Hole Hiking were each missing a page, AR Tab 24 at 1139, Tab 31 at 1195, Tab 43 at 1345-46; (2) Hole Hiking's pro forma income statement and operating assumptions failed to explain "why [Hole Hiking's] revenue projections are so much higher than historical projections and why some of the expense assumptions appear low," Tab 31 at 1195; *see also* AR Tab 24 at 1140; (3) Hole Hiking's pro forma income statement contained "numerous mistakes," AR Tab 24 at 1140, including "mathematical errors," Tab 31 at 1195; and, (4) Hole

Hiking's balance sheet contained certain unspecified "anomalies," AR Tab 43 at 1346, which raised "concern[s]" regarding Hole Hiking's financial position, AR Tab 24 at 1139.

The NPS nevertheless concluded that these deficiencies were immaterial, and that "[t]he Panel was able to evaluate the proposal and conclude [that] Hole Hiking had the financial ability to carry out the terms and conditions of the contract." AR Tab 43 at 1346. With respect to principal selection subfactor 4(a), the Park Service determined that "[a]lthough each AFR was missing a page, the panel was able to use the information provided [on the business history form and credit report] to estimate a positive net income." AR Tab 43 at 1345. Additionally, the NPS concluded that "[a]lthough the current liability information supplied on the balance sheet was somewhat ambiguous, Hole Hiking's credit report demonstrated that it had satisfied its liabilities in the past," and, "[t]herefore, the panel concluded [that] Hole Hiking would have the operating income to satisfy its liabilities." AR Tab 43 at 1345. With respect to principal selection subfactor 4(b), the NPS simply noted that "Hole Hiking submitted the requested forms." AR Tab 43 at 1346.

Eco Tour argues that "Hole Hiking did not fully explain its assumptions that future revenues would be much higher than past levels and expenses would be very low," and, therefore, the NPS arbitrarily and capriciously determined that the deficiencies in Hole Hiking's financial documentation were immaterial. Pl.'s Mot. at 36. Eco Tour also asserts that Hole Hiking's financial projections are "further suspect given that Hole Hiking reported total gross revenues in 2010/2011 of $21,835 based on 569 total tours," resulting in approximately $38 of revenue per tour – which Eco Tour contends is "well below the approved rates" under Hole Hiking's current contract (contract GRTE032-03). *Id.* at 36 n.9 (citing AR Tab 4 at 23-24 (listing annual gross revenue for the last three seasons under contracts GRTE024-03 and GRTE032-03), and Tab 8 at 186 (listing approved rates under Hole Hiking's current contract)); *see also* Tab 19 at 618 (listing Hole Hiking's projected revenue per tour under contract GRTE032-13). Defendant offers no rebuttal other than to assert that Eco Tour "misreads the charts" on the prospectus, which show that Hole Hiking led only 294 tours during the 2010/2011 season resulting in approximately $74 of revenue per tour – which defendant implies is much closer to the approved rates under Hole Hiking's current contract. Def.'s Mot. at 19 (citing AR Tab 4 at 23-24).

Here again, the court must agree with Eco Tour that the NPS failed to provide a rational basis for its determination that the errors and omissions in Hole Hiking's financial information were immaterial. Although the NPS rationally determined that Hole Hiking's omissions under principal selection subfactor 4(a) were immaterial (*i.e.*, missing pages in the AFRs and ambiguous current liability information on the balance sheet) because the NPS could determine from the business history form and credit report that Hole Hiking had "satisfied its liabilities in the past," AR Tab 43 at 1345, the NPS failed to even address the mathematical errors on Hole Hiking's pro forma income statement and Hole Hiking's unexplained revenue and expense projections. AR Tab 43 at 1346. Rather, the NPS merely stated, without explanation, that "Hole Hiking submitted the requested forms." AR Tab 43 at 1346. The NPS's failure to provide any explanation with respect to its materiality determination as to the pro forma income statement and operating assumptions is wholly arbitrary.

For the aforementioned reasons, the court concludes that each of the NPS's materiality determinations, as well as its resulting responsiveness determinations, was arbitrary, capricious, and an abuse of discretion. Therefore, the court must proceed to determine, as a factual matter, whether Eco Tour was prejudiced by the NPS's arbitrary and unlawful conduct. *See Bannum*, 404 F.3d at 1351.

### 4. Prejudice Resulting from the NPS's Responsiveness Determinations

As noted, to demonstrate prejudice, Eco Tour must show a "substantial chance" that it would have received the disputed contracts if not for the NPS's arbitrary and capricious responsiveness determinations. *See id.* at 1353. The court concludes that Eco Tour has made such a showing because it submitted responsive proposals that received the highest cumulative scores of any of the proposals received by the NPS for the disputed contracts. AR Tab 23 at 1094, Tab 24 at 1120, Tabs 28-29. Thus, in accordance with the regulations, there is a substantial chance that Eco Tour would have been awarded the disputed contracts if not for the errors alleged in the amended complaint. *See* 36 C.F.R. §§ 51.31, 51.33.

### B. The Agency's Disclosure of the Better Terms of Eco Tour's Proposals (Count II)

43

With respect to Count II, presented as an alternative to Count I, Eco Tour argues that the NPS improperly disclosed to Jackson Hole and Hole Hiking the better terms of Eco Tour's proposals in contravention of paragraph 4 of the prospectus instructions.  Pl.'s Mot. at 8-15, 40-42; Pl.'s Reply at 20-21.  That paragraph, titled "Proposals Considered Public Documents," provides as follows:

> (a)  All proposals submitted in response to this Prospectus may be disclosed by the Service to any person, upon request, to the extent required or authorized by the Freedom of Information Act (5 U.S.C. § 552).

> (b)  If you believe that your proposal contains trade secrets or confidential commercial or financial information exempt from disclosure under the Freedom of Information Act, mark the cover page of each copy of the proposal with the following legend:

>> The information specifically identified on pages of this proposal constitutes trade secrets or confidential commercial or financial information that the Offeror believes to be exempt from disclosure under the Freedom of Information Act.  The Offeror requests that this information not be disclosed to the public, except as may be required by law.

> You must specifically identify what you consider to be trade secret information or confidential commercial or financial information on the page of the proposal on which it appears, and you must mark each such page with the following legend:

>> This page contains trade secrets or confidential commercial and financial information that the Offeror believes to be exempt from disclosure under the Freedom of Information Act, and which is subject to the legend contained on the cover page of this proposal.

> (c)  Information so identified will not be made public by
> the Service except in accordance with law.

AR Tab 4 at 28.  Eco Tour asserts that the NPS, in paragraph 4, "promised offerors
. . . that it would not disclose confidential information included in the proposals."
Pl.'s Mot. at 40.  Eco Tour further asserts that its "reasonable assumption . . . in
light of [the] NPS's unqualified agreement to not disclose confidential information
was that [Eco Tour] would be provided with the opportunity to agree to have its
confidential information disclosed to its competitor, but that it did not have to
agree."  *Id.* at 40-41.  "If [Eco Tour] did not want this disclosure to occur, it would
have the option of withdrawing its proposal."  *Id.* at 41.

Eco Tour argues that the NPS improperly disclosed Eco Tour's confidential
information – in contravention of paragraph 4 of the prospectus instructions, and in
violation of the Procurement Integrity Act as well as the implied contract to
consider bids fairly and honestly – by identifying the better terms and conditions of
Eco Tour's proposals in the NPS's June 20, 2013 letters to Jackson Hole and Hole
Hiking.  *Id.* at 15, 40-41.  The allegedly confidential information disclosed to
Jackson Hole and Hole Hiking

> related to Eco Tour's policies as to minimizing idling
> time of its vehicles, ensuring it had maximized visitors'
> experiences through the use of binoculars, preventing or
> remedying spills of fluids from its vehicles, ensuring
> removal of human waste and other related waste,
> ensuring its guides had certifications and training to
> ensure the safety of all guests, the use of reusable
> products to minimize waste and quality control measures
> to ensure its guides were performing in an optimal
> manner.

*Id.* at 41 (citing AR Tabs 30-31, Tab 37); *see also id.* at 15.  Eco Tour contends
that it marked this information as confidential in accordance with paragraph 4 of
the prospectus instructions, and therefore was entitled to prevent the disclosure of
such information.  *Id.* at 9 (citing AR Tabs 21-22)); Pl.'s Reply at 20.

### 1.    Eco Tour Has Not Waived Its Unlawful Disclosure Claim

Defendant argues, unpersuasively, that Eco Tour has waived its objection to the NPS's disclosure of the better terms of Eco Tour's proposals.  Def.'s Mot. at 23; Def.'s Reply at 14.  The government's waiver theory is premised upon its characterization of Count II as a challenge to the terms of the prospectus, which notified potential offerors that "[i]f an existing Concessioner submits a responsive proposal and that proposal is not selected as the best proposal, the Preferred Offeror designation allows it to match the terms of the best offer and be awarded the Contract."  AR Tab 4 at 24.  Defendant contends that pursuant to this language in the prospectus, "Eco Tour . . . was on notice that 'terms of the best offer' could be disclosed" and, therefore, waived its right to object to this language by not objecting before the close of bidding.  Def.'s Mot. at 23 (citing *Blue & Gold Fleet*, 492 F.3d at 1313).  However, in Count II, Eco Tour does not object to any terms of the prospectus, but rather *invokes* the confidentiality provisions in paragraph 4 of the prospectus instructions.  *See* Pl.'s Mot. at 8-15, 40-42; Pl.'s Reply at 20-21.  Thus, defendant's waiver theory with respect to Count II is without merit.

### 2.    No Violation of the Procurement Integrity Act

The government asserts that Count II fails to the extent that it arises under the Procurement Integrity Act because NPS concession contracts are not "procurement" contracts, as that term is defined by the Procurement Integrity Act.  Def.'s Mot. at 23-24; Def.'s Reply at 14.  The court agrees.  The Procurement Integrity Act generally prohibits, "[e]xcept as provided by law," the disclosure of "contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates."  41 U.S.C. § 2102(a)(1).  "Federal agency procurement" is defined under the statute as "the acquisition (by using competitive procedures and awarding a contract) of goods or services (including construction) from non-Federal sources by a Federal agency using appropriated funds."  *Id.* § 2101(4).  The disputed concession contracts do not satisfy that definition.  First, as explained *supra*, the court concludes that NPS concession contracts, such as those in dispute in this bid protest, are not contracts for the procurement of goods and services.  Second, even if NPS concession contracts did involve the acquisition of goods or services for the benefit of the government, they do not involve the expenditure of appropriated funds by the NPS.  Rather, such contracts "provide for payment *to the government*

of a franchise fee or such other monetary consideration as determined by the Secretary." 16 U.S.C. § 5956(a) (emphasis added); *see also* 36 C.F.R. § 51.78 ("Concession contracts will provide for payment *to the government* of a franchise fee or other monetary consideration as determined by the Director upon consideration of the probable value to the concessioner of the privileges granted by the contract involved.") (emphasis added).  Therefore, the Procurement Integrity Act does not apply to Eco Tour's bid protest.

Additionally, defendant contends that even if the Procurement Integrity Act were applicable to the instant lawsuit, it has not been violated because the allegedly confidential information disclosed to Jackson Hole and Hole Hiking was already public knowledge.  Def.'s Mot. at 24-26; Def.'s Reply at 14-15.  Again, the court agrees with defendant.  As noted, the Procurement Integrity Act applies only to the disclosure of "contractor bid or proposal information."  41 U.S.C. § 2102(a)(1).  The term "contractor bid or proposal information" is defined as certain types of information submitted to a federal agency in connection with a proposal to enter into a procurement contract "if that information previously has not been made available to the public or disclosed publicly."  *Id.* § 2101(2).  The NPS's letters to Jackson Hole and Hole Hiking did not mention Eco Tour by name, nor did they disclose any information about the better terms of Eco Tour's proposals that was not otherwise publicly known.  *See* AR Tabs 30-31.  The twelve better terms of Eco Tour's proposals included:  minimizing the idling of vehicles; using binoculars, spill kits, human waste removal bags, and reusable plates, utensils, mugs, and water bottles; disposing of waste outside the park; requiring guides to receive Wilderness First Responder certification and training in winter driving and the Wilderness Act; and, unannounced monitoring of guides.  *See* AR Tab 30 at 1190-91, Tab 31 at 1193-94.  The availability of such practices, none of which involve the use of Eco Tour's proprietary information or trade secrets, is within the realm of public knowledge.  Indeed, as defendant notes, four of the twelve disclosed terms – the use of binoculars, spill kits, solid human waste removal bags, and disposal of trash outside the park – were already in use by one or both of the preferred offerors by the time the NPS sent its June 20, 2013 letters.  *See* AR Tab 19 at 578 (Hole Hiking's proposal stating that "[w]e carry plastic bags and offer to guest[s] if needed for any refuse. . . . [and] then dispose[] of [such bags] in appropriate container[s]," and that "[w]e purchase environmentally approved products such as recyclable napkins and containers"), Tab 20 at 642 (Jackson Hole's proposal stating that "[c]lients are educated on 'Leave-No-Trace' principles

47

and guides sweep all rest/break areas for waste before departing," and that Jackson Hole "commits to including a set of binoculars in every guide pack"), Tab 20 at 645 (Jackson Hole's proposal stating that "[a]ll guides carry one emergency 'wagbag'"), AR Tab 34 at 1204-05 (Jackson Hole's response to the NPS's June 20, 2013 letter stating that Jackson Hole "currently supplies spill kits for all vehicles and commits to continuing to do so," and that Jackson Hole "currently use[s] the *Wag Bag Wastekit* [human waste disposal] product" and "[a]ll guide packs are, and will continue to be, supplied with this product"), Tab 45 at 1405 (Hole Hiking's response to the NPS's June 20, 2013 letter stating that "[Hole Hiking] guides always carry a minimum of one pair of binoculars on each tour").

Eco Tour counters, unpersuasively, that the twelve better terms of Eco Tour's proposals that were disclosed by the NPS were not publicly known because, if they were, Jackson Hole and Hole Hiking "would have included those policies in their proposals." Pl.'s Mot. at 41; *see also* Pl.'s Reply at 21. Yet, of course, the fact that the preferred offerors did not include particular terms in their proposals does not prove that such terms were not publicly known. Next, Eco Tour asserts that, even if the twelve better terms of its proposals constitute public information when considered in isolation, its particular combination of such terms is a "confidential and strategic business decision." Pl.'s Reply at 20. According to Eco Tour, "[s]imply because the public knows that some of those items exist does not mean that a company's strategic decision to include them in its proposal is also public knowledge." *Id.* at 20-21. This argument, too, is unpersuasive. Under Eco Tour's argument, *any* business practice undertaken by a concessioner, no matter how commonly employed in the industry, would qualify as confidential so long as it is combined with other similarly common practices. This view is not in accordance with law. Although the court recognizes that a particular combination of individual pieces of information in the public domain may qualify as a trade secret if the combination is itself not generally known or not easily duplicated,[14] the combination of Eco Tour's twelve better terms does not meet that standard. As noted above, none of these twelve better terms involved proprietary information or trade secrets, and four of the terms were already in use by Jackson Hole and Hole

---

[14]/ *See, e.g.*, *Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 736-37 (4th Cir. 1993) ("[A]lthough a trade secret cannot subsist in information in the public domain, it can subsist in a *combination* of such information as long as the combination is itself a secret.") (citations omitted), *vacated pursuant to settlement and appeal dismissed*, Sept. 30, 1993.

Hiking.  Eco Tour has offered no evidence to support its view that the combination of the twelve better terms of its proposals was not generally known or not easily duplicated.

For the foregoing reasons, the court concludes that even if the Procurement Integrity Act were applicable to Eco Tour's bid protest, it was not violated in this instance because none of the information disclosed to Jackson Hole and Hole Hiking constitutes "contractor bid or proposal information" as defined by the Act.  Therefore, Count II fails to the extent that it is based upon an alleged violation of the Procurement Integrity Act.

### 3. No Breach of the Implied Contract to Consider Bids Fairly and Honestly

The government also argues that Eco Tour has failed to prove that the NPS's disclosure of the better terms of Eco Tour's proposals breached the implied-in-fact contract to consider bids fairly and honestly.  Def.'s Mot. at 27; Def.'s Reply at 16.  Again, the court agrees with defendant.  As noted, to recover under the implied contract for bids to be fairly and honestly considered, Eco Tour must establish that the NPS acted arbitrarily or capriciously, or abused its discretion.  *E.g.*, *Southfork*, 141 F.3d at 1132 (citing *Keco II*, 492 F.2d at 1203-04).  Four factors are generally relevant to a determination of whether the government has breached the implied contract to consider bids fairly:  (1) subjective bad faith on the part of the government; (2) the absence of a reasonable basis for the administrative decision; (3) the amount of discretion afforded to the procurement officials by applicable statutes and regulations; and (4) proven violations of pertinent statutes or regulations.  *Id.*

Eco Tour has not demonstrated that the agency's disclosure of the better terms of Eco Tour's proposals was motivated by bad faith, lacked a reasonable basis, or violated any statute or regulation.  To the contrary, under the regulations, the NPS was required to "advise the preferred offeror of the better terms and conditions of the best proposal and permit the preferred offeror to amend its proposal to match them."  36 C.F.R. § 51.32.  The NPS's June 20, 2013 letters to the preferred offerors complied with this regulatory provision.

Additionally, while paragraph 4 of the prospectus instructions provided that the NPS would not make public any information specifically marked in Eco Tour's proposal as a trade secret or as "confidential commercial and financial information," *see* AR Tab 4 at 28, Eco Tour failed to mark its proposals in accordance with paragraph 4. Specifically, Eco Tour failed to mark the cover pages of its proposals with the legend specified in paragraph 4(b), and also failed to specifically identify the allegedly confidential information in its proposals as required by paragraph 4(b). *Compare* AR Tab 4 at 28 (requiring the offeror to "mark the cover page of each copy of the proposal with the following legend" and to "specifically identify what you consider to be trade secret information or confidential commercial or financial information on the page of the proposal on which it appears"), *with* AR Tabs 21-22 (showing that Eco Tour's proposals lack legends on cover pages and specific identification of confidential information). Although Eco Tour marked most pages of its proposals with the general disclaimer set forth in paragraph 4(b), it failed to satisfy the second requirement of paragraph 4(b), which was to "specifically identify" the allegedly confidential information. *See* AR Tab 4 at 28 ("You must specifically identify what you consider to be trade secret information or confidential commercial or financial information on the page of the proposal on which it appears, *and* you must mark each such page with the following legend . . . .") (emphasis added). Therefore, even if paragraph 4 would otherwise prohibit the NPS from disclosing Eco Tour's properly identified confidential information, Eco Tour cannot take advantage of such protection after having failed to comply with the requirements of paragraph 4.

### 4.    Eco Tour Has Not Demonstrated Prejudice Resulting from the Alleged Improper Disclosure

Finally, the government contends that, even assuming that the NPS's disclosure of the better terms of Eco Tour's proposals violated the Procurement Integrity Act or breached the implied contract to consider bids fairly and honestly, Eco Tour has failed to demonstrate prejudice. The court must again agree with defendant. In its motion, Eco Tour asserts, without explanation, that the NPS's disclosure caused Eco Tour unspecified "substantial harm." Pl.'s Mot. at 41. Eco Tour reiterates this unsupported assertion in its reply brief and asserts that prejudice is "obvious." Pl.'s Reply at 21 ("[B]y unilaterally disclosing these products and services to Eco Tour's direct competitors and explicitly informing those competitors that their competitor offered a better proposal because of these

specific terms, NPS has now *totally eliminated Eco Tour's competitive advantage*. That is obvious prejudice."). These unsupported allegations of "substantial harm" and elimination of competitive advantage cannot satisfy Eco Tour's burden to demonstrate that the government's disclosure of the better terms of Eco Tour's proposals deprived Eco Tour of a "substantial chance" of being awarded the disputed contracts. *See Bannum*, 404 F.3d at 1353.

Eco Tour's only specific allegation of prejudice is that the NPS deprived Eco Tour of the opportunity to "weigh the risks of having its confidential information handed over to its competitors" and to choose between "agree[ing] to have its confidential information disclosed to its competitor" or "withdrawing its proposal." Pl.'s Mot. at 41. This allegation is likewise insufficient to demonstrate prejudice. As defendant correctly notes, "[a]n opportunity to withdraw from the competition would not have given Eco Tour a substantial chance of winning the competition." Def.'s Mot. at 28.

## C.   The Agency's Failure to Require Hole Hiking to Use Biodiesel Fuel (Count III)

With respect to Count III, also presented as an alternative to Count I, Eco Tour argues that the NPS violated applicable law, acted arbitrarily and capriciously, and abused its discretion when it found that Hole Hiking had matched the better terms of Eco Tour's proposal for contract GRTE032-13. Pl.'s Mot. at 15-16, 39; Pl.'s Reply at 14-19. In its proposal, Eco Tour stated that it has used biodiesel fuel in all of its vehicles since 2008, AR Tab 22 at 937, and that, "[u]nder the new concession contract, [it] will use biodiesel in over 60 percent of [its] vehicles until 100 percent of the vehicles have been converted [to] compressed natural gas," *id.* at 1086. Eco Tour contends that the NPS, by not requiring Hole Hiking to match this term of Eco Tour's proposal, violated 36 C.F.R. § 51.32, which requires the NPS to "advise the preferred offeror of the better terms and conditions of the best proposal and permit the preferred offeror to amend its proposal to match them." Pl.'s Mot. at 39.[15]

---

[15]/   In contrast to Jackson Hole, which indicated in its proposal for contract GRTE024-13 that it uses biodiesel [ ], *see* AR Tab 20 at 645, 668, Hole Hiking did not state in its proposal for contract GRTE032-13 that it uses any sort of alternative fuels [ ], *see* AR Tab 19 at 630.

In response, the government first argues that the NPS is not obligated to require Hole Hiking to use biodiesel in its vehicles in order to exercise a right of preference because doing so would violate 36 C.F.R. § 51.19, which prohibits the agency from awarding a concession contract which "materially amends" the terms and conditions of the draft concession contract set forth in the prospectus "[e]xcept for incorporating into the concession contract appropriate elements of the best proposal." Def.'s Mot. at 21; Def.'s Reply at 11.  In that regard, the government asserts that the utilization of alternative fuels in vehicles is not "appropriate" for the disputed contracts because such contracts are for cross-country ski tours, not vehicle-based tours.  Def.'s Mot. at 21; Def.'s Reply at 11.

Eco Tour argues, in rebuttal, that "the use of alternative fuel vehicles was appropriate and a better term in Eco Tour's proposal" because it "result[s] in greatly reduced emissions, thus protecting the environment in and around Grand Teton National Park" in furtherance of the goals articulated under principal selection subfactor 1(a) and secondary selection factor 1. Pl.'s Reply at 14.  The government responds that the only environmental practices required under principal selection subfactor 1(a) and secondary selection factor 1 are "those that protect the park from contamination," and that the use of alternative fuels is but one of "numerous environmental practices in [Eco Tour's] proposal" which "have nothing to do with protecting the park environment during a ski tour."  Def.'s Reply at 12-13.

By way of background, principal selection subfactor 1(a) directs offerors to "describe how you will conduct your operations in a manner that will minimize disturbance to Park wildlife by addressing . . . [t]he measures you will take to minimize disruption of wildlife while conducting tours."  AR Tab 4 at 43. Secondary selection factor 1 is the "quality of the offeror's proposal to conduct its operations in a manner that furthers the protection, conservation, and preservation of the park *and other resources* through environmental management programs and activities, including, without limitation, *energy conservation*, waste reduction, and recycling."  AR Tab 4 at 57 (emphasis added).

Eco Tour's argument regarding biodiesel is not without support in the record.  In rating Eco Tour's proposal for contract GRTE032-13 as "excellent" under principal selection subfactor 1(a), the evaluation panel noted that Eco Tour's commitment to an "idle free policy" with its tour vehicles helped to "minimize

disruption of wildlife while conducting tours." AR Tab 24 at 1122. The NPS also required Hole Hiking to match Eco Tour's "idle free policy" because such a policy "minimize[s] any disturbance to wildlife from the sound of a running vehicle." AR Tab 31 at 1193. In its proposal for contract GRTE032-13, Eco Tour stated that using biodiesel not only reduces total vehicle emissions, but also produces "less offensive" vehicle exhaust than petroleum-based fuel. AR Tab 22 at 937 ("Biodiesel is a fuel made in this country that has safer emissions than regular fuel. Life cycle analysis completed by the *National Renewable Energy Laboratory*, and later by *Argonne National Laboratory*, found that greenhouse gas emissions for biodiesel could be more than 52 percent lower than those from other petroleum products. In addition, the smell of exhaust is less offensive than petroleum exhaust."), 1086 ("The biodiesel fuel we have used since 2008 is produced in Colorado and is made from used vegetable oil or soybean oil. The fuel releases carbon dioxide into the air in smaller quantities than does petroleum-based fuel."). Thus, the record suggests that Eco Tour's use of biodiesel fuel, like its "idle free policy," may reduce the disturbance of wildlife in furtherance of the goals articulated under principal selection subfactor 1(a).

Additionally, in rating Eco Tour's proposal for contract GRTE032-13 as "very good" under secondary selection factor 1, the evaluation panel took into account Eco Tour's "multiple company-wide policies and practices related to environmental stewardship, *such as using biofuel*, using 'green' cleaning products, and contributing to a carbon-offset fund." AR Tab 24 at 1144 (emphasis added). Therefore, at least one of the goals articulated in the prospectus is the conservation of energy, and the NPS expressly recognized that Eco Tour's use of biodiesel fuel furthered that goal.

However, despite the foregoing, the court is unable to conclude that the NPS violated applicable law, acted arbitrarily or capriciously, or abused its discretion in not requiring Hole Hiking to use biodiesel or similar alternative fuels in its tour vehicles. First, in requiring the preferred offerors to adopt an "idle free policy" under principal selection subfactor 1(a), the NPS appears to have been primarily concerned with the disturbance caused by "the sound of a running vehicle." AR Tab 31 at 1193. Even if biodiesel fuel produces "less offensive" vehicle exhaust than petroleum-based fuel, *see* AR Tab 22 at 937, the record contains no evidence that vehicles using biodiesel fuel produce less noise than vehicles using petroleum-

based fuel.  Thus, the record does not establish that the use of biodiesel fuel achieves precisely the same environmental benefits as an "idle free policy."

Second, Eco Tour's use of biodiesel fuel was but one of several "company-wide policies and practices related to environmental stewardship" that the NPS considered in its evaluation of Eco Tour's proposal under secondary selection factor 1.  AR Tab 24 at 1144.  Other such policies and practices included utilizing "green" cleaning products and contributing to a carbon-offset fund.  *Id.*  Under Eco Tour's theory, the NPS should have required Hole Hiking to match each of these terms.  That the NPS did not do so provides support for the government's argument that the use of biodiesel fuel, like the use of "green" cleaning products and contributing to a carbon-offset fund, is outside the scope of the disputed contracts for guided cross-country ski tour concessions.

Therefore, although Eco Tour's use of biodiesel fuel could reasonably be viewed as furthering the goals articulated under principal selection subfactor 1(a) and secondary selection factor 1, Eco Tour has not shown that the NPS acted irrationally or arbitrarily in declining to require Hole Hiking to match this term, and the court will not second guess the agency's technical determination in that regard.  *See, e.g.*, *E.W. Bliss*, 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.") (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)); *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) ("[W]here an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984))).[16]

---

[16]/  In reaching this conclusion, the court declines to consider Eco Tour's citations to various extra-record evidence purportedly demonstrating that the use of alternative fuel was within the scope of the disputed contracts.  Pl.'s Reply at 16-19 (citing a "Fact Sheet" available on the NPS website and two articles available on the Department of Energy website).  As Eco Tour's extra-record evidence is not necessary for effective judicial review, and would not alter the court's analysis with respect to Count III even if the court were to consider it, the court grants defendant's motion to strike such evidence.  *See, e.g.*, *Axiom Res. Mgm't, Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

## IV.     Eco Tour is Limited to a Recovery of Bid Preparation Costs

Having determined that the NPS acted arbitrarily and capriciously in concluding that Jackson Hole's and Hole Hiking's proposals were responsive, and that Eco Tour was prejudiced as a result, the court now turns to the issue of the relief to be granted.  The government argues that the court lacks authority to grant Eco Tour's requested injunctive and declaratory relief "because 28 U.S.C. § 1491(b) does not apply to concession contracts, and 28 U.S.C. § 1491(a) provides for only monetary relief."  Def.'s Mot. at 28; *see also* Def.'s Reply at 17-20.  For the reasons specified below, the court agrees that it lacks the authority to award injunctive or declaratory relief to Eco Tour.  Therefore, Eco Tour is limited to an award of damages in the form of bid preparation costs.

Except in narrow statutorily defined circumstances, the Court of Federal Claims lacks jurisdiction to award injunctive or declaratory relief.  *United Keetoowah Band of Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1326 n.5 (Fed. Cir. 2007) (citation omitted); *Kanemoto v. Reno*, 41 F.3d 641, 644-45 (Fed. Cir. 1994) ("The remedies available in [the Court of Federal Claims] extend only to those affording monetary relief; the court cannot entertain claims for injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances . . . ."); *Terry v. United States*, 103 Fed. Cl. 645, 656 (2012); *Leitner v. United States*, 92 Fed. Cl. 220, 223 (2010) ("This Court may issue declaratory judgments or offer equitable relief only under an express grant of such jurisdiction in a federal statute." (citing *United States v. Testan*, 424 U.S. 392, 398 (1976), and *United States v. King*, 395 U.S. 1, 4 (1969))).  This court has statutory authority to award equitable relief in certain types of tax cases, *see* 28 U.S.C. § 1507 (2006); in "nonmonetary disputes" arising under the CDA, *see* 28 U.S.C. § 1491(a)(2); and, in procurement bid protests, *see* 28 U.S.C. § 1491(b)(2).  Additionally, in cases where the equitable relief is "'tied and subordinate to a money judgment,'" *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (quoting *Austin v. United States*, 206 Ct. Cl. 719, 723 (1975)), the court may "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records," 28 U.S.C. § 1491(a)(2).

The court concludes that none of these statutory provisions authorize the injunctive and declaratory relief requested by Eco Tour.  As an initial matter, this case is not a tax case, nor does it invoke the CDA.  Therefore, the first and second

statutory bases for equitable relief are inapplicable.  Additionally, as set forth *supra*, the court finds that the disputed concession contracts are not procurement contracts, and thus section 1491(b) is inapplicable.

Nor is Eco Tour entitled to injunctive or declaratory relief under section 1491(a).  In its reply brief, Eco Tour suggests that the court may grant equitable relief under section 1491(a)(2) because such relief would be "'incident of and collateral' to a monetary judgment."  Pl.'s Reply at 22-23 (quoting *Voisin v. United States*, 80 Fed. Cl. 164, 177-78 (2008)).  Yet Eco Tour has not cited any case in which equitable relief was granted under section 1491(a)(2) in the context of a claim for breach of the implied contract to consider bids fairly and honestly.

Additionally, the court concludes that Congress, by enacting ADRA in 1996, divested this court of authority to award equitable relief in bid protests pursued under an implied contract theory.  Before the enactment of ADRA in 1996, this court's jurisdiction over bid protests was predicated on an implied contract between the government and prospective bidders to treat bidders' proposals fairly and honestly.  *See, e.g.*, *Resource Conservation*, 597 F.3d at 1242; *Emery Worldwide Airlines*, 264 F.3d at 1078-80 (explaining the "long and complicated" history of judicial review of government procurement decisions); *Impresa*, 238 F.3d at 1331-32 (same); *Southfork*, 141 F.3d at 1132; *CACI, Inc.-Federal*, 719 F.2d at 1573; *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir. 1983); *Keco Indus., Inc. v. United States*, 428 F.2d 1233, 1237 (Ct. Cl. 1970) (*Keco I*).

Until 1982, an aggrieved bidder asserting an implied contract claim "was typically limited to monetary relief such as bid preparation costs."  *Impresa*, 238 F.3d at 1331 (citing *Keco II*, 492 F.2d at 1203, and *Finley v. United States*, 31 Fed. Cl. 704, 708 (1994)); *see also Keco I*, 428 F.2d at 1240 ("[I]f it should be determined subsequently by the commissioner that plaintiff's bid was not treated honestly and fairly by the Government, then plaintiff should be allowed to recover only those costs incurred in preparing its technical proposals and bid.").  In 1982, the court was first given authority to grant declaratory and injunctive relief in pre-award bid protests pursued under an implied contract theory.  Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, sec. 133(a), § 1491(a)(3), 96 Stat. 25, 39-40.  Such authority was formerly codified at 28 U.S.C. § 1491(a)(3), which provided, in pertinent part:  "'To afford complete relief on any contract claim

brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.'" *Resource Conservation*, 597 F.3d at 1244 n.10 (quoting former section 1491(a)(3)).

In 1996, however, Congress enacted ADRA, which "repealed former section 1491(a)(3), and enacted its substance as section 1491(b)(2)." *Id.* In so doing, Congress removed bid protest remedies from section 1491(a) and provided this court with a new, and independent, basis for bid protest jurisdiction in section 1491(b), under which the Court of Federal Claims is authorized to award "any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2); *see also Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, 118 (2002) (citations omitted).

Although the Federal Circuit has not had occasion to rule on the issue of whether the Court of Federal Claims has authority, post-ADRA, to grant equitable relief in implied contract bid protests pursued under section 1491(a), this court has consistently answered that question in the negative. *See Terry v. United States*, 96 Fed. Cl. 131, 153 (2010) (citations omitted) ("Under section 1491(a)(1), plaintiff is precluded from obtaining equitable relief, which is only available for a section 1491(b)(1) protest, and is limited to a recovery of monetary damages that comprise the costs she incurred while preparing her proposal."), *vacated in part on other grounds*, 98 Fed. Cl. 736 (2011); *FAS Support*, 93 Fed. Cl. at 694 ("The major difference between a protest brought under 28 U.S.C. § 1491(b)(1) and one brought pursuant to an implied contract under 28 U.S.C. § 1491(a)(1) is the equitable relief which is available for the section 1491(b)(1) protest, but not for breach of the implied contract. Only monetary relief is available for breach of the implied contract, comprising the costs incurred in preparing the proposal and bid." (citing *Keco I*, 428 F.2d at 1240)); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 731 n.5 (2000) (noting that a claim for breach of an implied-in-fact contractual obligation to consider and treat all bids fairly "no longer is the trigger for injunctive relief in this court"); *W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 641 (1997) ("The repeal by [ADRA] . . . of § 1491(a)(3) eliminated this court's statutory authority to grant equitable relief on the basis of the old implied contract theory."); *cf. L-3 Commc'ns Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394, 397 (2010) ("Section 1491(a)(1) continues to allow any plaintiff, including a disappointed bidder, to invoke this Court's general contract

jurisdiction to recover money damages, including bid preparation and proposal costs.").

While the court is not bound to follow its prior decisions concerning the availability of equitable relief in bid protests pursued under an implied contract theory, it finds the reasoning of those decisions to be persuasive. Simply put, if equitable relief was unavailable in implied contract bid protests pursued under section 1491(a) until the enactment of section 1491(a)(3) in 1982, and section 1491(a)(3) was repealed with the enactment of ADRA in 1996, then it follows that equitable relief is again unavailable in implied contract bid protests pursued under section 1491(a). Accordingly, the court concludes that Eco Tour is precluded from obtaining injunctive and declaratory relief.

In its reply brief, Eco Tour argues that "this Court has the explicit authority from Congress [under section 1491(a)(2)] to issue as declaratory relief an order remanding this matter to NPS with directions as to what this Court deems proper and just." Pl.'s Reply at 23. Specifically, Eco Tour asks the court to "remand with a direction for NPS to review its decision that the preferred offerors' proposals were responsive and, even if NPS continues to find such proposals responsive, to provide direction that Hole Hiking needs to match Eco Tour's better terms." *Id.* at 24. The court rejects Eco Tour's request for a remand.

Even if the court were authorized to grant a remand under section 1491(a)(2) in connection with a bid protest pursued under an implied contract theory (an issue which is far from certain[17]), Eco Tour's requested remand is beyond the scope of any such authority. Eco Tour would shoehorn into the court's ability to remand with "proper and just" directions unfettered authority for the court to issue essentially unlimited orders to the agency, such as requiring Hole Hiking to "match Eco Tour's better terms." Pl.'s Reply at 24. This treads beyond the proper scope of remand into the realm of injunctive relief. The power to remand with "proper and just" instructions cannot trump the unavailability of injunctive and declaratory relief under section 1491(a). *See, e.g.*, *Todd Const., L.P. v. United States*, 88 Fed. Cl. 235, 245 (2009).

---

[17]/ Eco Tour cites no authority supporting the grant of a section 1491(a)(2) remand in the context of a bid protest pursued under an implied contract theory, and the court has found none.

For all of the foregoing reasons, the court concludes that Eco Tour is precluded from obtaining injunctive or declaratory relief and is limited to a recovery of monetary damages that comprise the costs Eco Tour incurred while preparing its proposal.  Accordingly, the court need not consider the parties' remaining arguments concerning the particular equitable relief requested by Eco Tour.

## CONCLUSION

The Park Service acted arbitrarily and capriciously in concluding that the financial information omitted from Jackson Hole's and Hole Hiking's proposals for the disputed contracts was immaterial, and therefore that Jackson Hole's and Hole Hiking's proposals were responsive to the requirements of the prospectus. Accordingly, in allowing Jackson Hole and Hole Hiking to match the better terms of Eco Tour's proposals for the disputed contracts, the Park Service breached the implied contract for bids to be fairly and honestly considered.  As Eco Tour submitted responsive proposals for the disputed contracts that received the highest cumulative scores of any of the proposals received by the Park Service, Eco Tour has demonstrated a "substantial chance" that it would have received the disputed contracts if not for the Park Service's arbitrary and capricious responsiveness determination with regard to the proposals of Jackson Hole and Hole Hiking. Having established prejudice resulting from the Park Service's arbitrary and capricious action, Eco Tour is entitled to judgment on the administrative record.

The court encourages the parties to resolve the bid preparation costs issue amicably, preferably by stipulation as to an amount due Eco Tour.  If such a resolution is not achieved, Eco Tour must file a motion and accompanying brief in support of its request for bid preparation costs.  The parties are directed to confer to determine how they wish to proceed with respect to determining the amount of bid preparation costs Eco Tour is entitled to receive in light of the court's resolution of this protest.  The court also encourages the parties to explore and address the issue of attorney fees and costs in advance of any necessity to litigate that issue.  Defendant shall file a status report as to the results of the parties' negotiations in that regard on or before January 6, 2014.

Accordingly, it is hereby **ORDERED** that[18]

(1)    Plaintiff's Motion for Judgment on the Administrative Record, filed September 20, 2013, is **GRANTED**;

(2)    Defendant's Motion for Judgment on the Administrative Record, filed October 22, 2013, is **DENIED**;

(3)    Defendant's Motion to Dismiss for Lack of Jurisdiction, filed August 15, 2013, is **DENIED** as moot;

(4)    Defendant's Motion to Strike References to Documents Outside of the Administrative Record Made Within Plaintiff's Opposition to Defendant's Motion for Judgment on the Administrative Record, filed November 1, 2013, is **GRANTED**;

(5)    On or before **December 20, 2013**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary or confidential marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter;

(6)    On or before **December 20, 2013**, defendant shall **FILE**, as a separate **UNSEALED** document on CD-ROM, a redacted version of the administrative record filed August 12, 2013, as well as redacted versions of the supplements to the administrative record filed on September 6, 2013 and October 1, 2013, so as to establish a proper public record of this protest;

(7)    The parties shall **CONFER** and attempt a resolution of plaintiff's requests for bid preparation costs and attorney fees and costs; and

---

[18]/  In ¶ 5 of the ordering language in the sealed version of this opinion issued on November 26, 2013, the court directed the entry of final judgment in favor of plaintiff. However, because the quantum of Eco Tour's bid preparation costs has yet to be determined, the court defers entry of final judgment pending the court's final disposition regarding Eco Tour's bid preparation costs.

(8)    On or before **January 6, 2014**, defendant shall **FILE** a **Status Report** as to the results of the parties' negotiations regarding plaintiff's requests for bid preparation costs and attorney fees and costs.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge